## CHARLES S. HILTON et ux. vs. WM. H. TYRRELL AND OLIVER HUGHES, Sheriff.

*Bill to Restrain Execution—Allegations of Fraud and Mistake in Settlement of Partnership Affairs—Mistake of Facts Caused by Party's Own Negligence.*

Plaintiff and defendant were partners and upon a dissolution of the firm plaintiff purchased defendant's interest in the concern, assuming its liabilities, and gave to the defendant a note for the amount agreed upon with a provision for confession of judgment. Plaintiff filed the bill in this case to restrain an execution on the judgment alleging that the statement of the affairs of the firm, upon the faith of which the note was executed, was made fraudulently by the defendant and contained an under estimate of the firm's liabilities; and also alleging that the settlement was made in consequence of a mistake as to certain facts. Defendant denied all fraud and alleged that the settlement was made on the basis of the offer of a specific sum of money for his interest in the business, and not, as alleged by the plaintiff, that the plaintiff was to pay one-half of the value of the assets as determined by the inventory. *Held*, upon an examination of the evidence in the case.

1st. That the defendant was not guilty of any fraudulent statement or concealment in the course of the transaction.

2nd. That the plaintiff had failed to prove by a preponderance of evidence that any mistake as to the facts had been made, and also that if the plaintiff did make a mistake it was the result of his own negligence, since a cursory examination of the books of the firm, which were accessible to both parties, would have shown him the true state of the accounts, in regard to which his alleged mistake existed, and that consequently the plaintiff is not entitled to the relief asked for.

Appeal from a decree of the Circuit Court for Harford County (WATTERS, J.), dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and JONES, JJ.

*Albert Constable* and *James J. Archer* (with whom was *Robert Archer* on the brief), for the appellant.

*S. A. Williams*, for the appellee.

Boyd, J., delivered the opinion of the Court.

Charles S. Hilton, one of the appellants, and William H. Tyrrell, one of the appellees, were engaged in the general merchandise and drug business in the town of Aberdeen, in Harford County, under the name of Hilton & Tyrrell. On the 15th of April, 1895, they dissolved partnership and Hilton purchased Tyrrell's interest and assumed the liabilities of the firm. Not having the ready money, he gave his own note for $150, which was paid in a short time, and the single bill of his wife and himself for $1,850, payable two months after date— $2,000 being the amount agreed upon to be paid for Tyrrell's interest. The single bill contained a provision for confession of judgment and on July 24th, 1895, a judgment was entered by the Clerk of the Circuit Court for Harford County for $1,735.39 and costs—there being some credits endorsed on the single bill. An execution was issued on that judgment and the bill in this case was filed August 6th, 1895, alleging that the agreement was that a statement should be prepared showing the assets and liabilities of the firm and that Hilton was to give his obligation for one-half of the net assets thus ascertained. It charges that Tyrrell undertook to state the account and prepared a statement which he told Hilton was fair and correct, but was in fact fraudulent, containing "a most gross under estimate of the firm liabilities," and by his fraud and misrepresention induced the plaintiff to accept it. The assets, amounting to $6,009.44, are alleged to have been correctly stated, but it is charged that the liabilities, instead of being $2,883.11, as stated by Tyrrell, were $4,617.56, and Tyrrell owed the firm $34.70 instead of nothing, as he falsely represented; that one-half of the net assets thus only amounted to $695.94 instead of $1,563.16½ and after deducting the $34.70 the half was only $661.24. The bill states that Hilton agreed to give Tyrrell $436.83½ as a gratuity to be added to the $1,563.16½, thus making the $2,000.00. The plaintiffs further charged that the true amount due by Hilton is $392.72, which he had tendered to the sheriff, together with all costs incurred, and that the judgment was entered without

authority. The bill then prays (A) that Tyrrell may be ordered to surrender the obligation for $1,850 upon being paid the sum of $392.72, and costs ; (B) that he be required to enter the judgment satisfied upon receiving that sum and costs; (C) that the sheriff be enjoined from selling Hilton's property under the execution on said judgment, and (D) for general relief. By agreement the bill was amended so that it alleged mistake as well as fraud on the part of Tyrrell in making the statement. The answer denies fraud and mistake, but alleges that Hilton agreed to pay Tyrrell $2,000 for his interest in the firm. Testimony was taken and the Court dismissed the bill, but intimated that the judgment could be stricken out on the law side of the Court on the ground that it was void. Hilton then made that application and the judgment was stricken out, but on appeal to this Court that action of the lower Court was reversed—the question being in that case whether the judgment was validly entered by the clerk. *Tyrrell* v. *Hilton*, decided at October term, 1900, 92 Md. 176.

The appellants now seek relief on the ground that the single bill was obtained through the false representations of Tyrrell as to the liabilities of the firm, and they contend that whether it was made fraudulently or by mistake is immaterial. Hilton says that Tyrrell undertook to ascertain the condition of the firm and fraudulently represented the liabilities to be something over $2,800, while in fact they were over $4,600. Considerable testimony was taken by the appellants to show that Tyrrell was a competent bookkeeper and was experienced in business matters, but if all that is claimed for him in that respect be conceded, it is manifest that Hilton was more familiar with the business than Tyrrell. He was conducting it in April, 1894, when Tyrrell became a partner, and had been for several years. He had experience as a merchant, which Tyrrell had not previous to the partnership. If, in point of fact, the liabilities of the firm were over $4,600, instead of $2,800, it is difficult to understand how Hilton could have been deceived by anything Tyrrell did. One of the items omitted, according to his claim, was rent due him amounting to $200. The

book in which the inventory was taken and a list of " unpaid
invoices " made in the handwriting of Tyrrell, was before Hil-
ton. The latter list was made up of a number of items,
covering parts of four pages in that book, which amounted to
$1,706.36. When Tyrrell showed that list to Hilton the lat-
ter said that was not all of the liabilities and he (Hilton), got
from the bank a list of the discounts which amounted to $1,100.
Hilton wrote below the list of " unpaid invoices," " Bank
Disc'ts " on one line and on the next two " other liabilities in-
cluding " Bills Pay." He therefore must have known that
there were other liabilities besides the unpaid invoices and dis-
counts in bank and the amount of the latter he had gotten
himself and handed to Tyrrell, who carried out the figures
" 1,100.00 " opposite the words " Bank Disc'ts." The " Bank
discounts" included the paper executed by the firm, or members
of the firm, which they had discounted in bank. Five out of
the seven notes in the list were signed by both members—the
other two being signed in the firm name. One dated April
11th, 1895, and payable six days after date, for $146, was ap-
parently not included in the list, as including that they amount
to $1,246. Hilton was asked what he said when Tyrrell
handed him the statement of the $1,700, and he replied " I
said there were other liabilities, that that amount was not all of
it. I called his attention to our bank discounts and bills payable
and other liabilities." He claims not to have added up that
list, but it would be difficult to believe that a man of his experi-
ence and intelligence, as shown by the evidence, would not
have known by even a cursory glance that the seven items in
it amounted to about $1,100. He saw, or could have seen if
he had looked, what were included in the list of invoices, and
what in the list of bank discounts, and if he did not know that
they did not include all of their liabilities, why should Tyrrell
be expected to know and be charged with fraud for not telling
him ? But there are some items which Hilton certainly did
know of, long before he said he found out the discrepancy,
which he fixes as on or after July 2nd. He certainly knew
what rent was due himself. One item he testified to as omitted

was that of $400 due Hood, Faulkrod & Co., and another was a note of John A. Horner & Co. for $150. On May 23rd, 1895, he wrote to Tyrrell " I send you a letter I received from J. A. Horner & Co. They seem to be inclined to push for a settlement and to enforce the law on me, relative to co-partnership dissolution settlement. If you care to sign, do so and return to me. I will ask you not to place the note you have for collection. I will make you a direct payment on it." On June 18th, he wrote " I send you check for $50 on note. This is best I can do now as Hood, Faulkrod & Co. are pushing through attorney for settlement of balance of $300 due them and they must not get judgment, as you know that would be an act of insolvency. They and Jno. A. Horner & Co. will not release Hilton & Tyrrell, but seem bent on being as contrary and disagreeable as they can." He added a postscript to that letter as follows: " Horner & Co. are due 21–24 inst. and I will give them $98 and new note for one month $200, please sign and return enclosed." On June 28th he wrote returning the $200 note intended for Horner & Co. which they refused and on June 29th he wrote explaining why his check for $50 had gone to protest, for which and costs of protest he had sent another check, and he said, "My friends, Horner & Co., gave me twenty-four hours to cancel $298 note and it had to be fixed, consequently the protest. I do not intend to have any one sue me (in this case it would have been H. & T.) for an honest debt if I can help it. That you know, is an act of insolvency, there is no need of it with our resources." That letter was written about two months and a half after dissolution and up to that time there was not the slightest suggestion in his letters that he had been imposed upon. Not only had all the bank discounts matured before then, but every note of the firm recorded in the book marked "notes and bills payable" had also—all of the latter in April and May, except one for $26.74. The firm notes in that book, exclusive of bank discounts, amount to $911.35, and the protested notes held by Hood, Faulkrod & Co. amounted to $400. The note omitted from the list of

bank discounts for $146.00 was due April 20th, and the rent
due him was $200. These sums amounting to $1,657.35,
which constitute the greater part of the difference between the
$2,800 and $4,600 were therefore certainly known to him be-
fore he wrote the letter of June 29th, and most of them long
before that time. He had in his possession the books show-
ing what was included in "unpaid invoices." It is therefore
asking a great deal to expect any one to believe that he did
not know until after July 2nd, as he now says, that these lia-
bilities were not in existence. Yet he wrote the letters of
June 18th and June 29th, 1895, above referred to. In the
former he said, "I have so far paid on discounts and bills
$1,700, and in another two months hope to be free from an-
noying debt; then I can begin to pay you, although I shall
not fail to remember you whenever opportunity affords in the
interval." He had also renewed a number of the notes as
shown by entries in the list of "notes and bills payable" and
may have renewed others which are not entered there. In the
latter letter (June 29) he said, "I hope in sixty days to have
open accounts in shape that is paid in full—then I shall be in
a position to cancel your note in decent style. In the mean-
time I promise to remember you as best I can." He thus
not only had the opportunity to know that the $1,100 did not
include all the liabilities outside of "unpaid invoices," but he
had actual knowledge that at least $1,457.35, besides his rent
of $200, over and above those included in that list making up
the $1,100 were due when he wrote those letters. But there
is not a suggestion that he had been imposed on and he made
no such claim until after Tyrrell had placed the single bill in
the hands of an attorney for collection. Even after that, July
2nd, 1895, Hilton wrote expressing surprise at what had been
done and added, "Do you not think it would have been better
to have told me that you needed the money at once, and to
have made a special auction sale to make the sum? I shall
expect to hear from you immediately and in the event of your
intention to force me I now inform you that I shall fight
you a good fight. I want only my rights and to give you

yours." It is true that he says he did not know, until he made the investigation after he got the letter from Tyrrell's attorney, the amount of the liabilities, although he said "in the latter part of May I began to think the liabilities of the late firm must have been more than $2,800 odd dollars from the fact that although I was paying out all the time, things did not appear to be getting any easier and demands were as pressing as ever, although I was not sure there was any mistake," etc. He said when he commenced to investigate "I opened the note-book and on the first two pages saw at a glance $800 or $900 of the firm liabilities that had been left out," and again, "Anybody could have seen the notes if they had opened the books and looked at them. They were right there and the largest part of them on the first page of the book." Yet he had the note-book right before him—made entries in it time after time, beginning on the very next line after the last one entered before the dissolution, and expects the Court to believe that *he* did not know of them before July 2nd, but that Tyrrell did know them and was guilty of fraud of not inform-ing him of facts which it was impossible for him (Hilton) not to know if he "opened the books and looked at them" and which he "saw at a glance" when he did open them. We can-not without prolonging this opinion to an unreasonable length, quote all of the testimony on that snbject, but we are con-vinced from a careful study of it that it does not justify us in reaching the conclusion that Tyrrell was guilty of fraud in the transaction.

The next inquiry to be made is not simply whether there was *any mistake*, but whether they settled on the terms they did by reason of such mistake. Just a year before Tyrrell had paid Hilton $1,950 for a one-half interest in the busi-ness. They concluded there was not enough in it to justify both continuing in it, and as Tyrrell was a telegraph oper-ator, he determined to get employment in that line of bus-iness. They then agreed to take an inventory, which they did and both took part in it. Tyrrell admits that the original idea was to ascertain their assets and liabilities, so as to know

the interest of each partner, and he further admits that according to his figuring the liabilities were only something over $2,800, but says he got that from the books and what Hilton told him. In answer to the question why the statement was made, he said, "Well, the object in making the statement was looking to a dissolution of the partnership. That was the understanding when we first talked of dissolving the partnership, *but it was not settled on that basis.*" On April 15th, he said to Hilton, "Charlie, let's settle up this business," and Hilton called him into the back room and said: "Well, you see how about things are, and I was going to make you this kind of a proposition, that I would be willing to give you $2,000 and take the business and assume the liabilities and I think I can get the money from my mother about the middle of June to pay you off. I have not got the money right now, of course, but I think I can get it from my mother about the middle of June. And I told him that was perfectly agreeable to me and that we would accordingly make the note payable on the 15th of June." He said as he needed some money at once it was then agreed that he would take one note for $150, payable in about two weeks, and the other payable the 15th of June. He said, "$2,000 was about what I had put in the business and that would let me out even." Hilton's account of the transaction was "as I had every confidence in Mr. Tyrrell I entrusted entirely to him to make out a statement of the firm liabilities. This he did representing the same to be $2,883.11, I think. I have it here on the book, $2,883.11. This is an inventory made out in Mr. Tyrrell's handwriting at that time. Deducting the amount of liabilities from the resources, which he did on a slip of paper, and showed his interest at that time to be $1,563.16½. He came to me with a very long face and appeared to be very much disappointed in the result. In view of this, and the understanding between us that I should be allowed plenty of time to pay off these obligations of the firm of Hilton & Tyrrell, and would give me plenty of time to pay off his interest to him, and believing it would be to my

advantage, I told Mr. Tyrrell I would be willing to pay him $2,000, which was the amount he claimed to have put in the business.  This I gave him in two notes, one for $150 and one for $1,850, payable at the First National Bank of Aberdeen. At that time I believed it to be to my advantage to settle up with Mr. Tyrrell in that way, as I had done a prosperous business before he came and was of the opinion I could do a prosperous business after he was gone, knowing too that the firm of Hilton & Tyrrell was not making money." He said the difference between the $1,563.16 and the $2,000 was a gratuity.

The difference between them is that Hilton claims that the settlement was made on the basis of the interest of the respective parties, as found by taking the liabilities at $2,883.11, while Tyrrell claims that the final settlement was not dependent on the statement of liabilities that was prepared, but Hilton made him an offer for his interest and he accepted it. There can be no doubt that they did undertake to ascertain the condition of the firm in connection with the proposed dissolution, but Hilton does not claim that the note he gave was for the sum ascertained by dividing the difference between the assets and liabilities, but says, as we have seen, that the half of that difference was $1,563.16 and the balance was a gratuity on his part.  If Tyrrell's theory is correct, it is manifest that this bill cannot be sustained, for according to him he did not agree to sell and Hilton did not agree to buy for one-half of the difference between the assets and the liabilities as ascertained by the inventory.  If it had shown that difference to be about $1,400, as Hilton now claims it was, Tyrrell had not agreed to sell his interest for $700, which would have resulted in a loss to him of $1,250 in one year.  As far as they went, in ascertaining the net assets of the firm, they figured them at something over three thousand dollars, but the half of that was not all of its value to Hilton.  He says he had succeeded in the business before Tyrrell came and believed he could still succeed if Tyrrell was out.  He had certainly as good, and we believe better, opportunities to know the firm's true condi-

tion as Tyrrell did.    When asked who kept the books during the partnership he replied, "Both Mr. Tyrrell and myself, although I kept them more than he did." · Tyrrell swore that he made out the statement from the books and information Hilton gave him, and although Hilton denies that, in part at least, there can be no doubt that the testimony shows that Hilton was more familiar with the business than Tyrrell was.

We have then the two parties to the transaction giving different explanations of the way in which the price was agreed upon—Hilton swearing he was only bound to pay for the half interest as determined by the inventory, and Tyrrell claiming it was not settled on that basis, but on the specific offer of Hilton of $2,000 which was accepted by him.    It is incumbent on the plaintiffs to make out their case, but we have the only two witnesses to that agreement flatly contradicting each other and the letters we have referred to above tend to sustain Tyrrell.    In addition to them, Hilton's letter of April 29th, shows that he did expect to get the money from his mother.    It says "I write to tell you not to negotiate the $1,850 paper.  Upon inquiry at home I have found that the money I expected to get is an investment that my mother is to use during her life.  She does not care to change it and you will consequently have to indulge me a little.    I feel pretty sure I can entirely release you in six months and shall make a special effort to give you a creditable payment on the 15th of June with a satisfactory renewal."    It is well settled that a party who seeks relief in equity on the ground of mistake must produce clear and convincing proof of the existence of such mistake.    Hilton being thus contradicted by Tyrrell, and there being no evidence to sustain him, we cannot assume that he was right and that it was agreed that he would buy out Tyrrell for one-half of the net assets of the firm over and above the liabilities, and Hilton's letters, written several months after the dissolution, when he must have known the true condition of the firm, tend to sustain Tyrrell.

But even if it was established that the settlement was thus made by reason of the mistake as to liabilities, Hilton would

not under the circumstance be entitled to relief, for as was said in *Wood* v. *Patterson,* 4 Md. Chy. 339, "It is not, however, in every case of mistake, even of a material fact, that the Court will grant relief, for if the mistake is the result of the party's carelessness or inattention the Court will not interfere in his behalf, its policy being to administer relief to the vigilant and to put all parties upon the exercise of a reasonble degree of diligence. So if the fact be unknown to both parties, or in regard to which each has equal and adequate means of information, if in such cases the parties have acted in good faith, equity will not interfere." Or as quoted from *Story's Equity Jurisprudence,* section 151, in *Groff* v. *Rohrer,* 35 Md. 333, "where each party is equally innocent, and there is no concealment of facts which the other party has a right to know, and no surprise or imposition exists, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference. It is strictly *damnum absque injuria.*" It was said in *Kearney* v. *Sascer,* 37 Md. 276: "Now whilst it is well settled that Courts of equity will grant relief in certain cases where parties have acted in ignorance or under misapprehension in regard to material facts, it is equally clear that they do not lightly interfere with judgments rendered after trial, or deliberately confessed by the parties. It is not sufficient to state merely that injustice has been done but that it has been done under such circumstances as will authorize the Court to interfere. *Mistake as to facts will not entitle a party to relief, if the mistake arose from negligence or want of due diligence, such as may fairly be expected from a reasonable person.*" See also *Hunt* v. *Stuart,* 53 Md. 225. There can be no doubt that Hilton could not have made such a mistake as he now alleges was made, if he had used the most ordinary diligence, for he admits that it was only necessary to open the book, or merely glance at it, to see that some of the items he now mentions were omitted from the statement made out by Tyrrell. Persons with such opportunities as he had to know or to ascertain the true condition of affairs about which they are dealing, have no right to ask a Court of

equity to relieve them of their own gross negligence, to the extent of setting aside a judgment regularly entered by authority of an instrument solemnly made by them as this one has been determined to have been.    It is true Hilton claims to have relied on Tyrrell, but *that* Tyrrell denies and claims he relied on Hilton for the information on which he acted in making up the statement, and the burden is on the plaintiffs. But if that were not so, Hilton could not have been deceived if he had not been grossly negligent.    If he did make the offer of $2,000 by reason of a mistake as to the amount of liabilities, it was an inexcusable mistake on his part, when the knowledge he actually had and that which he had the opportunity to have are remembered.

In the case of *Redgrave* v. *Hurd*, L. R. 20, Ch. Div. 1, so much relied on by the appellants, there was fraud proven, but in this case, as we have said, we do not think the evidence justifies that charge against Tyrrell.    Then too that was a case where the one party had all the facts in his possession while the other did not, but here the dealings were between two partners both of whom were actively engaged in the business, had equal and constant access to the books and the purchaser was more familiar with the business than the vendor. It would be useless to discuss the other cases cited by the appellant as those in Maryland referred to above show the doctrine that has been established here in cases of this character.

Other points were suggested at the argument, such as the impossibility of restoring Tyrrell to the position he gave up when he accepted the notes and turned the property over to Hilton, but we need not discuss them and for the reasons we have given the decree of the lower Court will be affirmed.

> *Decree affirmed, the costs above and below to be paid by the appellants.*

(Decided June 14th, 1901.)