MARY CARTER WHITE and A. ROBINSON WHITE,
Her Husband,

*vs.*

MARTHA PORTER SHAFFER and MATILDA FRAN-
CES SMITH.

*Written instruments: reformation of—; jurisdiction of—;*
*laches.*

The power of a court of equity to decree the reformation of
a written instrument on the ground of a mistake is an extraor-
dinary one, and not only must it be shown by conclusive proof
that the error complained of was mutual, but the precise agree-
ment that the parties intended, but failed to express, must be
proved beyond a reasonable doubt.                              p. 360

Application for the reformation of a written instrument
must be made promptly, and the defense of laches runs from
the time of the discovery of the mistake.                     p. 361

In this instance, a delay of seven years and other evidence of
laches were held fatal to a petition for the reformation of a
deed.                              .                           p. 363

*Decided February 16th, 1917.*

Appeal from the Circuit Court for Baltimore County. In
Equity. (McLane, J.)

The cause was argued before Boyd, C. J., Briscoe,
Burke, Thomas, Urner and Stockbridge JJ.

*Edward L. Ward,* for the appellants.

*Robert Biggs* and *Joseph Judge* (with whom was *T. Scott
Offutt* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

The appeal in this case was taken from a decree of the Circuit Court for Baltimore County, dated July 12th, 1916, by which a confirmatory deed, which will be hereinafter more particularly referred to, was reformed. A brief outline of the material facts, out of which the questions presented by the record arise, will now be given.

Matilda Frances Smith in August, 1889, was the owner of a large tract of land in Baltimore County located on or near a public highway, known as the Avalon Forge, or Gun Road. In August, 1889, Mrs. Smith granted and conveyed to A. Robinson White about five acres of this land. This tract was located on the east side of the Avalon Forge Road and bounded on the centre thereof. Mr. White in 1890 conveyed the tract to his wife, Mary Carter White. On May 15th, 1891, Mrs. Smith sold and conveyed to Mrs. White a lot of 3 66/100 acres adjoining and lying immediately to the east of the first mentioned lot. As this lot lay between the land of Mrs. White on the north and that on the south of the lot conveyed to Mrs. White, it was understood and agreed that a right of way through the lot should be reserved. The right of way reserved by the deed was as follows: "Subject, however, to the use by the said Matilda Frances Smith, her heirs and assigns, of a road sixteen and a half feet wide, to be forever kept open for the benefit of said Matilda Frances Smith, her heirs and assigns, and lying to the east and binding on the fifth line of the lot now intended to be conveyed." Some errors of description were discovered in the deed for the 3 66/100 acre lot, and on February 2, 1893, Mrs. Smith executed and delivered to Mrs. White, under the circumstances hereafter stated, a confirmatory deed. After describing the land conveyed and stating that it is the same that was attempted to be conveyed by the deed of May 15, 1891, but which had been therein erroneously described, contained this reservation: "Subject, however, to the use by the said Matilda Frances Smith, her heirs and assigns, of a road sixteen and a half feet wide, to be forever left open for the

benefit of the said Matilda Frances Smith, her heirs and assigns, lying to the west and binding on the fourth line of the lot now intended to be conveyed.

On the 20th of September, 1894, Mrs. Smith sold and conveyed to Martha Porter Shaffer a six-acre lot lying to the south of the 3 66/100 acre tract through which the above described way had been reserved in the deed of May 15, 1891, to Mrs. White. Mrs. Shaffer paid part of the purchase price of the lot and began the erection of a dwelling house thereon before an examination of her title had been completed. The examination of the title disclosed the fact that the road reserved in the confirmatory deed was not the one reserved by the one of May 15th, 1891, between Mrs. Smith and Mrs. White. It was an entirely new way, located on the land of the grantor, led nowhere and was utterly useless. She then informed Mrs. Smith of the error in the confirmatory deed with respect to this right of way. She alleged in her bill, "that she thereupon brought said error to the attention of said Matilda Frances Smith, who in view of such error was unable to execute a deed to her with an absolute grant of the right to use the road as located in the deed of May 15th, 1891." It is an established fact in the case that prior to the 20th of September, 1894,—the date of the deed from Mrs. Smith to Mrs. Shaffer,—that both the grantor and grantee had full knowledge of the mistake in the confirmatory deed complained of in this case. The deed to Mrs. Shaffer granted the right to use the way reserved in the confirmatory deed, and "especially the right to use thereof in common with other owners abutting thereon to a road laid out southwardly of said herein described lot and adjacent thereto, and especially described and reserved in the deed from Matilda Frances Smith to David M. Patterson hereinbefore referred to." This way is spoken of in the testimony as the Patterson right of way, and it was only one used by Mrs. Shaffer and her successors in title, but it is not a desirable road, and was described by one of the witnesses as "a narrow and tortuous descent from Mr. Burke's house

down to the Baltimore and Ohio Railroad," and Mr. Burke testified that at some points it was dangerous. But it has been used constantly by Mrs. Shaffer and her successors in title for more than twenty-two years as the only means of ingress and egress to and from her property.

The bill in this case was filed by Martha Porter Shaffer and Matilda Frances Smith on the 29th of July, 1901, for the reformation of the confirmatory deed of February 2, 1893,—more than eight years after its execution and more than six years after the plaintiffs had full knowledge of the mistake alleged. The ground upon which the reformation is asked is that the location of the road reserved in the confirmatory deed was a mutual mistake of the parties; that it was meant by both parties to locate the road to the east and along the fifth line of the property described. The prayer of the bill was "that the said alleged confirmatory deed from Matilda Frances Smith to Mary Carter White, 'Exhibit D,' may be reformed in accordance with the intention of the parties as hereinbefore set out, *i. e.,* by substituting in the clause of reservation the words, 'and lying to the east and binding on the fifth line' in lieu of the words 'and lying to the west and binding on the fourth line'; and for other and further relief." The decree appealed from reformed the deed in accordance with the special prayer of the bill. By an amendment to the bill made on June 21st, 1902, Mrs. Smith was stricken out as a party plaintiff. The bill was further amended. The defendants demurred to the amended bill, and the Court overruled the demurrers, and the defendants on November 12th, 1902, appealed, and by an opinion of this Court filed April 22nd, 1903, the rulings of the lower Court were affirmed and the cause was remanded for further proceedings. The mandate of this Court was filed in the Court below on May 28th, 1903, and the answers of the several defendants were filed on June 25th and July 14th, 1903, and replications thereto were promptly filed. Nothing further was done towards the prosecution of the case until July

19th, 1915,—more than twenty-two years after the execution of the deed, and more than twelve years after the institution of the suit—when John H. Burke and Katherine Burke, his wife, were upon their petition made parties plaintiffs in the cause. In the meantime Martha Porter Shaffer by deed dated March 11th, 1907, sold and conveyed the property to John P. Kavanaugh, who occupied it for more than three years, and on the 9th of August, 1910, conveyed it to Burke and wife, who did nothing towards prosecuting the case for more than four years after they had acquired title. Mrs. Smith and Mrs. Shaffer are dead. Touro Smith, who will be referred to later, and the justice of the peace who took the acknowledgment of the deed are dead, and the only surviving person, who had knowledge of the circumstances under which the deed was executed is Mr. White, who represented his wife in the transaction.

The plaintiffs incorporated in the bill, as an explanation of their delay in instituting the suit, the following allegations: "That since the execution of said confirmatory deed and the discovery by the said Matilda Frances Smith and Martha Porter Shaffer of the error therein contained in reference to the location of said right of way intended to be reserved, your oratrix, Martha Porter Shaffer, has frequently made the defendants, Mary Carter White and A. Robinson White, her husband, offers and suggestions looking toward an amicable settlement of the difference between them, without, however, getting a decided and final rejection of the same, until shortly before the filing of this bill, and has delayed instituting legal proceedings for the correction of said mistake in the hope and belief that the said defendants, being her neighbors and on good terms in respect to other matters, would prefer and decide to agree to the correction of said confirmatory deed amicably and without legal proceedings; notwithstanding which delay from the time of the discovery of said mistake until the time of the filing of this bill of complaint in this cause none of the defendants have been prejudiced in any way by the failure of your oratrix to take

earlier action in the premises, nor has the position of any of said defendants with reference to said reserved right of way been changed in any degree, they having from time to time used the bed of said roadway for farming purposes with other portions of said 3 66/100 acre lot, with full knowledge of the fact that your Oratrix claimed the rights to the use thereof, and the said defendants never having erected any improvements thereon or gone to any expense with reference to or concerning the same, or used the same at any time, or in any way, with the belief that your Oratrix had abandoned her claim thereto." Referring to this explanation, the Court said on the former appeal (*White* v. *Shaffer,* 97 Md. 359): "The allegations of the bill in the present case explanatory of the delay in filing it might be more specific than they are, but we regard them as sufficient to afford a *prima facie* rebuttal of the presumption of laches on the part of the appellee in asserting her rights. These allegations in substance are that she delayed filing the bill in 'the hope and belief of the success of overtures for an amicable adjustment of the controversy, which she asserts were repeatedly made by her to the defendants and not definitely rejected by them until shortly before the bill was filed; and further that the status of the roadbed had continued to be such that the appellants had not in fact been prejudiced by the delay in filing the bill."

The answer of Mr. and Mrs. White denied the allegations of the bill upon which the plaintiffs relied to have a reformation of the deed, and with respect to their explanation of the delay alleged: "These defendants deny that the plaintiff has ever made them or either of them any offer, offers or suggestions looking toward an amicable settlement of the alleged differences between them other than the tender to them of the deed aforesaid in the latter part of the year 1900, or ever made any claim to said alleged right of way before that time, and these defendants aver that when said deed was tendered at the time aforesaid the plaintiff was given a prompt answer and the defendants' refusal to accept it and refused to recog-

nize the plaintiff's claim in any way; and further answering said tenth paragraph, these defendants deny that they had any knowledge that the plaintiff claimed to be in any way entitled to any right of way over said three and 66-100 acre lot until the latter part of the year 1900, as above mentioned, and these defendants also deny that they would not now be prejudiced by the plaintiff not having taken earlier action if she could now enforce her alleged claim to the right of way in the said bill claimed and mentioned for the reason that since the purchase by the plaintiff of the said six acre lot in the year 1894, these defendants have laid out and have expended much money, time and labor in grading the land contained in said three and 66-100 acre lot, and have extended their garden over a part of the same where the alleged right of way claimed by the plaintiff would run; and have expended much money improving the said land for garden purposes by expensive fertilizers; and have planted therein large beds of recurring fruits and vegetables and fruit trees, and have gone to great expense in improving and remodelling their dwelling house, the plan of the same depending upon the privacy afforded by their holding the said three and 66-100 acre lot; and have been to much expense in building a cistern for the drainage of said dwelling, which cistern is located within the limits of the alleged right of way claimed by the plaintiffs; and therefore if said claim of the plaintiff could be and was now enforced by this Honorable Court, all the above-mentioned expenses and property of these defendants would be almost if not entirely lost to these defendants, and they would lose the privacy which they now enjoy and is of much value to these defendants, and relying on which they made the alterations and additions to their dwelling aforesaid."

It is alleged in the fourth paragraph of the bill: "That the said Matilda Frances Smith not having at that time sold the lower or six acre lot of land for the benefit of which said road or way was reserved and having at that time no neces-

sity to use the said road, the said defendants requested that she allow them to extend their fences on the northern and southern lines of said 3 66/100 acre lot across the same representing to her that permission to so extend said fences would relieve them of the necessity of building a line fence along the eastern side of said road parallel to and sixteen and one-half feet distant from the one already built along the eastern line of said Mary Carter White's five acre lot and the said Matilda Frances Smith agreed that they should so extend their said fences with the understanding however that the same should be removed whenever she might sell said six acre lot or otherwise have need for the use of said roadway whereupon the said defendants so extended said fences with the understanding aforesaid."

There is no evidence in the record to support the allegations of the bill as to overtures and suggestions looking to an amicable adjustment of the controversy about the road. The only evidence on this question is that none were made, and the allegations of the fourth paragraph are denied by Mrs. Smith, whose testimony was taken in 1902.

We will now state the circumstances under which the confirmatory deed was executed, and how the appellants have dealt with the property since the title thereto was acquired by Mrs. White. Mr. White discovered errors in the description of the property in the deed of May 15th, 1891, and the object of the confirmatory deed was to correct these misdescriptions. The deed was prepared and submitted to Touro Smith, a son of Matilda Frances Smith, who appears to have been consulted by his mother and who represented her in all real estate transactions. When submitted to him the deed contained the precise reservation of the road as it appeared in the original deed. In a few days Touro Smith returned the deed to Mr. White, having in his own handwriting changed the location of the road by striking out the fifth line and inserting the fourth line as it now appears in the confirmatory deed. What took place when this change was

called to the attention of Mr. White appears by his uncontradicted evidence: "I showed him on the ground that that was not the line that I thought he wanted reserved in the deed, and had some argument with him, and he said, well, that is the deed my mother will sign, and no other. Well, I said, it suits me exactly, but it is not the line you said you wanted. Well, he said, that is the line we want and we will not sign anything else. * * *   Q. And this change which Touro indicated struck you as so unusual that you rather argued with him about it, didn't you? A. I told him exactly what I said in my direct testimony. I said, This is not what you said you wanted, but it suits me exactly, and if you all are satisfied I am certainly satisfied. It does away with any future dealings." The deed was subsequently executed by Mrs. Smith with the location of the way changed as insisted upon by her son, Touro.

When Mrs. White took possession of the lot in 1891, the north end of the right of way was obstructed by a fence across it, and that fence has continued to the present time. She erected a division fence on the south side of the lot, which effectually cut off all access to the proposed way. Mrs. Shaffer, the husband of Martha Porter Shaffer, helped to keep this fence in repair. The evidence shows that no demand was made by Mrs. Smith or Mrs. Shaffer for the removal of the fence and no claim was made by any one until shortly before the bill was filed. There was a deep gully across this proposed road. This was filled up by Mrs. White. Some kind of a disposal plant, used in connection with her dwelling house was located in this roadway and a portion of the way has been used and is now used as a garden. There can, we think, be no doubt, that the opening of this way would result in prejudice to Mrs. White in many ways.

The question is whether under this state of facts, the plaintiff is entitled to a decree for the reformation of the deed. This Court said in *Dulany* v. *Rogers,* 50 Md. 524: "If parties enter into an agreement, and through an error in the

reduction of it to writing the written agreement fails to express their real intentions or contains terms or stipulations contrary to their common intention, a Court of equity will correct and reform the instrument so as to make it conform to the intention of the parties. *Wake* v. *Harron,* 1 H. & C. 202; *Beaumont* v. *Bramley,* T. & R. 41; *Ashhurst* v. *Mill,* 7 Hare, 502; *Barrow* v. *Barrow,* 18 Beav. 529; *Scholefield* v. *Lockwood,* 33 L. J. Ch. 106; *Druiff* v. *Parker,* L. R. 5 Eq. 137; *Reade* v. *Armstrong,* 7 Ir. Ch. 266.

It is incumbent, however, upon the party seeking to reform a written instrument to show by conclusive proof, that it does not embody the final intention of the parties,—as courts will not rectify it unless it was executed under a common mistake,—both parties having done that which neither of them intended. A mistake on one side may be ground for rescinding, but not for reforming a written agreement;" and in *Miller* v. *Stuart,* 107 Md. 23, JUDGE SCHMUCKER stated the rule as follows: "The power confided to courts of equity of cancelling or reforming written instruments is universally conceded to be an extraordinary one whose exercise must be guarded with zealous care and granted only in a clear case. If the ground upon which its exercise is invoked be a mistake, as in the present case, a mistake on one side will not be sufficient. It must be a mutual one. *Dulany* v. *Rogers,* 50 Md. 524; *Stiles* v. *Willis,* 66 Md. 552; *Farmville Ins. Co.* v. *Butler,* 55 Md. 233. Not only must a mutual mistake be shown, but the precise agreement which the parties intended but failed to express must be proven beyond a reasonable doubt. *Second Natl. Bank* v. *Wrightson,* 63 Md. 81; *Bouldin* v. *Wood,* 96 Md. 336. And the evidence required for this purpose must be of the strongest character and the proof must be convincing. *Keedy* v. *Nally,* 63 Md. 311; *Hilton* v. *Tyrrell,* 93 Md. 657." In *Keedy* v. *Nally,* 63 Md. 311, JUDGE ALVEY said that "the alleged intention of the parties to which it is sought to make the agreement conform must be shown to have continued in their

minds concurrently down to the time of the execution of the instrument." Applying the principle announced in these cases, which have been uniformly followed by this Court, to the facts of this case we cannot hold that the confirmatory deed was executed under a *mutual mistake* of the parties. Mr. White certainly knew the terms of the deed, and also knew precisely where it located the road. He called this fact to the attention of Touro Smith, who was representing his mother, and the error in locating the road in that deed was not due to a mistake on the part of Mr. White, but to the insistence and negligence of Touro Smith.

But apart from this, we are of opinion the application must fail upon the grounds of acquiescence and *laches,* both in the institution and failure to prosecute the suit. We have set out fully the facts upon these questions. The universally recognized rule is that the application for the reformation of a written instrument must be made promptly and that time runs from the discovery of the mistake. *McDowell* v. *Goldsmith,* 2 Md. Ch. 370; *Keedy* v. *Nally,* 63 Md. 311; *Beard* v. *Hubble,* 9 Gill, 431; *Hunt* v. *Stuart,* 53 Md. 225; *Hewitt's Appeal,* 55 Md. 509.

This Court said in *Robertson* v. *Mowell,* 66 Md. 539, when speaking of *laches,* that "Courts have wisely abstained from attempting to lay down any general or inflexible rule to govern all cases;" and it was said in *Glenn* v. *Smith,* 17 Md. 260, that when questions of this kind arise in courts of equity it is a sound maxim that each case should be determined according to its own facts. Long lapse of time, unexplained, to assert one's known rights, gives rise to a strong presumption of acquiescence, and "laches in the prosecution of a suit is as fatal to recovery as delay in its institution." *Hadaway* v. *Hynson,* 89 Md. 305; *Johnston* v. *Standard Min'g Company,* 148 U. S. 370.

The appellees placed great reliance upon the language of JUDGE McSHERRY in *Demuth* v. *Old Town Bank,* 85 Md. 315, to defeat the defense of *laches.* While the principle

governing *laches* is the same in all cases, the facts of that
case were widely different from this. The *laches* there relied
on was the failure of the bank to foreclose a mortgage upon
the property in controversy prior to its conveyance to the
appellants. What was decided was that the bank was under
no obligation to foreclose the mortgage and no injury or
prejudice to the plaintiff resulted from its failure to do so.
The Court said: "It has been repeatedly said that the appli-
cation of the doctrine of laches depends on the circumstances
of each particular case, and whilst in the abstract this is
true, it is apt to be misleading if the constituent and essen-
tial elements which go to make up laches, in the technical
sense of the term, are overlooked or disregarded. Strictly
speaking, and using the term as it is understood in the law,
laches is such neglect or omission to assert a right as, taken
in conjunction with lapse of time more or less great, and
other circumstances causing *prejudice* to an adverse party,
operates as a bar in a Court of equity. LORD ELLENBOROUGH
said in discussing the question whether a failure to present a
bill of exchange at the specified place of payment was suffi-
cient to discharge the acceptor: 'Laches is a neglect to do
something which by law a man is obliged to do. Whether
my neglect to call at a house where a man informs me that
I may get the money amounts to laches depends on whether
I am obliged to call there.' *Seleg* v. *Abitol,* 4 M. & S. 462.
Obviously, then, there must be a legal duty to do some act,
a failure to do that duty and attendant circumstances which
cause prejudice to an adverse party before the doctrine can
be successfully invoked. Mere lapse of time, without more,
unless of sufficient duration to amount to and constitute the
bar of the statute of limitations, will not be sufficient. Now,
there was clearly no duty which the bank owed any one to
foreclose the mortgage prior to the date of the deed to the
appellants. Its omission to do so anterior to the date of the
purchase by the appellants was not, therefore, the omission
to do something which by law it was required to do; and the

subsequent delay—that is the delay between the date of the purchase by the appellants and the filing of the decree appealed from—placed the appellants in no worse position than they occupied the very moment they paid the purchase money to and took the deed from Price.

"No act of the Old Town Bank, and no omission on its part to do something that it was legally bound to do, operated to prejudice the appellants, unless the mere naked failure to secure an assignment of the mortgage and to have that assignment recorded was an omission to perform an act which the bank was obliged to perform. But the decided cases we have referred to conclusively establish that no such duty or obligation rested on the bank. The essential elements of laches are, therefore, wanting."

In this case Mrs. Shaffer knew of the alleged mistake as early as September, 1894. It was her duty to have promptly applied to have it remedied. She remained passive for nearly seven years. She saw the appellants enclose the roadway, fill up the gully which ran across it, and adopt and utilize the way for the purposes and in the manner above stated. After her rights, as set up in the bill, had been established by this Court in 1903, she remained in possession for nearly four years and then sold the property to John P. Kavanaugh—having in the meantime done nothing to prosecute the case. Kavanaugh took no action whatever during his three years' ownership of the property. No reason or explanation of this long delay is shown, and the present plaintiffs did nothing whatever in the case for nearly five years after they had acquired title. Under the facts and circumstances disclosed by the Record, such delay and acquiescence must be a bar to the relief prayed for. The decree appealed from must be reversed and the bill dismissed.

> *Decree reversed and bill dismissed, with*
> *costs to the appellants.*