MOYER ET UX. *v.* TITLE GUARANTEE COMPANY

[No. 140, September Term, 1961.]

500

*Decided February 14, 1962.*

*Motion for rehearing filed March 16, 1962, denied March 23, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, MARBURY and SYBERT, JJ.

*Eben F. Perkins,* with whom were *Perkins & Rich* on the brief, for the appellants.

*Walter C. Mylander, Jr.,* and *Charles C. W. Atwater,* with whom was *Thomas A. Garland* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

The chancellor's decree reformed a policy of title insurance, issued by appellee to the appellants, whereby the land covered by said policy was reduced from 16.68 acres to 10.2 acres; and enjoined the prosecution of an action at law, instituted by appellants against the appellee, claiming a breach of said policy by the appellee in that appellants had been evicted from 6.48 acres of land insured to them.

On July 8, 1955, appellants entered into a contract with one Leonard Boyd, and his wife, for the purchase of certain property fronting on the north side of Liberty Road in Baltimore County. The description of the land to be conveyed was somewhat unusual, so we summarize it in pertinent part:

> "being approximately ten (10) acres, more or less, and specifically including land bounded by existing fences on North and East sides of the property, and improved by a * * * dwelling, * * *, including driveway, better known as the * * * Boyd property * * * and better described in the Land Records * * * in Liber R.J.S., 1420, folio 214 [this deed was from one Ruff, et ux, to the Boyds and conveyed 16.68 acres in one description, which description was the same as that of the property named in the title policy and the deed from the Boyds to the Moyers, both to be mentioned shortly hereafter] * * *."

One week after the execution of the contract, the then attorney for appellants filed an application with appellee's predecessor for a title insurance policy. Under the heading "description of property" therein was "10 acres Ns [north side] Liberty Road above Randallstown," and under "reference to title" was "R.J.S. 1420, folio 214," the same deed mentioned above in the contract of sale. On August 4th, appellee submitted a report to appellants' attorney, which at its beginning referred to "In re: 10 acres—NS Liberty Road," but then went on to report good (with certain exceptions

not here involved) in the Boyds the "fee simple title to all that lot of ground * * * more particularly described in the enclosed copy of the deed [which deed was the one proposed to consummate the transaction, and had been prepared by the appellee, containing the same description of 16.68 acres as that in the deed recorded in R.J.S. 1420, folio 214] * * *."

Settlement took place on August 25th. Sometime during the period between when application for the policy was made and the settlement, Maurice Elliott, an attorney and title examiner for the appellee, called Hamilton Whiteford, counsel for the appellants; and, as a result of their conversation, Elliott made this notation on the application, "according to Mr. Whiteford all prop of Boyd is to be conveyed, which is 16.68 acres." Neither Elliott nor Whiteford had any independent recollection of the conversation, the date when it occurred, or what brought it on; hence, the best either could do was to testify as to "apparently" what had occurred.

The deed executed and delivered to the appellants at the settlement, and subsequently recorded, purported to convey 16.68 acres in one perimeter, it being a duplicate of the proposed deed sent out with the title report; and the appellee issued its title insurance policy to the appellants covering the "16.68 acres, more or less" described in said deed.

Some four years after the settlement, appellants discovered that in 1947 the Boyds had conveyed 6.48 acres of the land, described in their title policy and deed, to a certain James Doyle, III, and his wife. This was an irregular shaped corridor located to the rear of the main Boyd property. The appellee freely and frankly admitted, and still admits, its mistake in overlooking this conveyance-out by the Boyds; but, after negotiating, the parties were unable to reconcile their differences, and the law action mentioned above and this suit followed.

The chancellor decided the title policy should be reformed upon two grounds, namely, mutual mistake and equitable estoppel. After setting forth the standard of proof required by law before the granting of the extraordinary relief of the reformation of a written instrument, we shall discuss the two grounds under separate headings.

The request for the reformation of a written instrument is one for unusual relief, and when granted, it differs from rescission, cancellation or annulment of the document. Unlike these, the instrument remains in force and effect, but in a modified, or changed, form; hence, before granting the high remedy of reformation, the proof must not only establish that the written agreement was not the agreement intended by the parties, but also what was the agreement contemplated by them at the time it was executed. And in many cases, the evidence, for the main part, is oral testimony. *Hoffman v. Chapman,* 182 Md. 208, 34 A. 2d 438. Before performing the difficult and delicate task of reforming an agreement after the parties have solemnized it by reducing it to writing and executing the same, this Court has consistently required proof of the highest order. In *Keedy v. Nally,* 63 Md. 311, 316, Judge Alvey, for the Court, said that the plaintiff, "must not only show clearly and beyond doubt that there has been a mistake, but he must also be able to show with equal clearness and certainty the *exact* and *precise* form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties." (Emphasis added.) Again in *White v, Shaffer,* 130 Md. 351, 360, 99 A. 66, it was stated: " 'Not only must a mutual mistake be shown, but the precise agreement which the parties intended but failed to express must be proven beyond a reasonable doubt. *Second Nat'l Bank v. Wrightson,* 63 Md. 81; *Bouldin [Boulden] v. Wood,* 96 Md. 336 [332] (53 A. 911). And the evidence required for this purpose must be of the strongest character and the proof must be convincing.' " The Court, in *Brockmeyer v. Norris,* 177 Md. 466, 473, 10 A. 2d 326, quoted, with approval, this passage from Pomeroy: " 'Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error.' " See also *Hubble v. Somerville,* 187 Md. 418, 422, 50 A. 2d 565; *Urquhart v. Alexander,* 218 Md. 405, 411, 147 A. 2d 213.

## MUTUAL MISTAKE

In 4 *Pomeroy, Equity Jurisprudence* (5 Ed.), § 1376, it

is stated that equity has jurisdiction to reform written instruments in but two well-defined cases: (1) where there is a mutual mistake—that is, where there has been a meeting of the minds—and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto; and (2) where there has been a mistake by one party accompanied by fraud or other inequitable conduct of the remaining parties. In such cases, the instrument may be made to conform to the agreement or transaction entered into according to the intention of the parties. See also 5 *Williston, Contracts* (Rev. Ed.), § 1535, *et seq.* This statement of Professor Pomeroy seems to be in complete accord with the Maryland decisions.

We turn now to a consideration of the evidence to see if the appellee has met the high burden required of it to justify the relief sought. It is conceded that appellee made a mistake as already pointed out above, but if appellee is to be granted relief on the ground of a mutual mistake, it is incumbent upon it to show that appellants made the same mistake.

Appellee contends that the description in the contract of sale clearly showed that the appellants were to get only about 10 acres of land, the boundaries thereof were definitely pointed out to Mr. Moyer by Mr. Boyd, one of the sellers, and Nora Cloney, the real estate agent, and the only reason for the erroneous description being in the title policy was the mutual mistake of it and the Moyers.

The Moyers, on the other hand, emphatically deny any mistake on their part (as Mr. Moyer handled the transaction for his wife and himself, we shall hereafter refer to the Moyers in the singular number). Moyer stated that he was, and is, a layman; that in entering into the contract involved he was particularly interested in two things—the acreage and full ownership of, and control over, the driveway (which was being utilized to accommodate a nearby dwelling); and that the reference in the contract to the fences on the north and east sides of the property was to assure him that the property bought extended at least to them. He wanted to be certain of just what he was getting and that is the reason he instructed his attorney to have the title searched and insured.

When the preliminary report came, he was disappointed in that the driveway was subject to an easement, which he was told would relieve him from consummating the contract if he desired, but the proposed deed showed 16.68 acres to be conveyed to him, so he informed his lawyer that he would think it over. The description in the contract of "approximately 10 acres, more or less" in a specified deed from Ruff to Boyd could, as far as he knew, amount to 16.68 acres. He had a rough plat of the property made and it showed the corridor in dispute. He therefore asked his lawyer to recheck the acreage with the title company, and the lawyer reported that he had done so and 16.68 acres of land was what Moyer would receive. After reflecting and considering all of the circumstances, he decided to go through with the contract, even though it entailed an easement in another in the driveway; but he would not have done so, had he not thought he was receiving the acreage called for in the deed. At the time of settlement, he and his attorney checked the deed and his title policy to ascertain that he was getting this amount of land, and there was no mistake on his part whatever; if he had known or thought the title company was making a mistake, he would have employed another to make the title search.

Mr. Whiteford, although frankly admitting that he could not recall with accuracy the details after so long a lapse of time, corroborated Moyer in several important details. He recalled that Moyer was particularly interested in the acreage and the driveway, and, after receiving the title report, Moyer was distressed about the driveway situation. And he produced a copy of a letter from him to Moyer dated August 5th, which accompanied the preliminary title report and the proposed deed, wherein Whiteford stated: "This deed will give you the description [it called for 16.68 acres as stated above] in which you were interested." Most of the other details, Whiteford, after "six busy years," could not recall.

The appellee and the chancellor considered two factors as vital to the appellee's case, namely, that the boundaries of the Boyd property had been definitely pointed out to Moyer and he received this property in his deed, which was all that

he was entitled to; and the notation made by Elliott on the application, "according to Mr. Whiteford all prop of Boyd is to be conveyed, which is 16.68 acres" established the fact that Whiteford had, innocently, made a "false representation" to the appellee. More will be said of this second question later.

In regard to the boundaries having been shown Moyer, the chancellor stated: "I accept the testimony of Mr. Boyd and Mrs. Cloney that they pointed out to Mr. Moyer the well-defined boundaries of the only property that the Boyds owned." Although it is extremely unlikely that the testimony in this regard could be held to meet the high degree of proof necessary in a case of this nature,[1] we shall assume that it did, for the chancellor decided that the crucial time for determining the "intention of the parties" was "when Mr. Whiteford *applied* (emphasis ours) for the title insurance," and, in so doing, he clearly fell into error. This is not a suit to reform the application for title insurance or the contract of sale; their only relevance here is whatever probative force they have in establishing the intention of the parties to the title policy at the time of its execution. It is obvious that when the application was made, no one knew what the policy, if issued at all, would contain. In order for the appellee to obtain relief on the ground of mutual mistake, it was necessary for it

---

1. Boyd testified he saw Moyer at the property on one occasion; he did not recall what kind of a day it was or whether either Mrs. Moyer or Mrs. Cloney was present; the rear or northern portion of the property was fenced up "around the barn." When asked what conversation he had had with Moyer about the property (and this is all of his testimony on the specific point), he replied: "As I recall—it's been some time—only once did I show Mr. Moyer where the fence came around. I said that's the property line." Mrs. Cloney, after stating she had shown a lot of property since the Moyer transaction, said she did not remember discussing acreage with Moyer, and she would say there were fences on the west, north and east sides of the property (without otherwise locating them). Then she was asked, Did you not say that you pointed out the fences to the Moyers? She answered: "That bounded the property, yes, I did, sir. I pointed out it bounded the property, because that was my marking." The reformed description in the decree consumes a page and a half of single spaced typing, and contains some ten courses and six calls.

to establish, by the high standard of proof named above, that there had been an agreement reached by the parties (and what the agreement was), and the parties intended to carry out that agreement at the time of the execution of the written instrument, but failed to do so because of a mutual mistake. We have outlined above all of the evidence, including the exhibits, that has any direct bearing on the intention of the parties. We find nothing in the record sufficient to support a finding that, at the time of the execution of the title policy, which was the critical time, Moyer thought he was only entitled to get, and was getting, title insurance on 10.2 acres instead of 16.68 acres.

## EQUITABLE ESTOPPEL

The chancellor stated that the case seemed to contain "the classical elements of an equitable estoppel." It is apparent that if the appellee be entitled to relief upon this ground, the facts must come within the purview of (2) of § 1376 of *Pomeroy, op. cit.* which is broad enough to include equitable estoppel. The chancellor concluded that the notation made on the application by Elliott, "according to Mr. Whiteford all prop of Boyd is to be conveyed, which is 16.68 acres" established the fact that Whiteford, though innocently and in good faith, gave "false information" to the appellee. With this conclusion, we are unable to agree. Although no one could recall when the notation was made, it seems quite certain that this was done after receipt of the preliminary title report and the proposed deed calling for 16.68 acres, but before the settlement. This is because all agree that it was made before settlement, and Whiteford definitely remembered he had no idea of the acreage actually owned by the Boyds before receiving the report, and he scarcely could have produced the area of 16.68 acres out of thin air.

The only portion of the notation that could have caused any confusion was, "which is 16.68 acres." Elliott, who made the notation and had no independent recollection of his conversation with Whiteford, did not testify whether Whiteford told him the Boyds owned 16.68 acres, whether the notation was the witness' interpretation of the conversation he had

had with Whiteford, or whether the 16.68 acre feature thereof was the result of the company's title search. He was asked to explain the reason for the notation, and he stated that "apparently" after the application came in and some work was done on it, some question came up as to the amount of acreage. He was then asked, "Who raised the question?" He replied, "This has been a long time ago. I'm not—I don't think I could answer that. Apparently the reason for my notation on there was that I called Mr. Whiteford and asked him how much acreage was to be conveyed and that is apparently what he told me, because I have noted it on there. I can't tell you when I put it on, because there is no date." We have pointed out above that evidence of such an inconclusive nature will not suffice to satisfy the burden cast upon a plaintiff in a case of this character. The notation, apparently made after receipt by Moyer and his attorney of the preliminary report and a proposed deed calling for 16.68 acres of land, was, we think, consistent with Moyer's statement that after receiving said instruments and weighing the situation as it had developed, he asked his lawyer to have the Title Company recheck the acreage. Quite possibly it could have been made as a result of Whiteford's informing Elliott that Moyer was to receive all of the Boyd property (which was an accurate statement), and the proposed deed called for 16.68 acres. In any event, it lacks the clear, satisfactory, and convincing character required to establish inequitable conduct on the part of Moyer so as to warrant reforming the policy. It would seem rather anomalous that a title company, which has been employed to search a title and inform the purchaser what property the sellers own, would be misled by a statement of purchaser's counsel relative to the sellers' title.

From what has been said above, the decree must be reversed.

*Decree reversed, and the bill of complaint dismissed; appellee to pay the costs.*