**In re ESTATE OF Drewry
E. HASKINS, Jr.**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Sept. 19, 2006 Session.

Oct. 31, 2006.

Permission to Appeal Denied by
Supreme Court March 12, 2007.

John P. Konvalinka, Mathew D. Brownfield, and Jennifer Hooks Lawrence, Chattanooga, Tennessee, for the Appellant, Drewry E. Haskins III.

Charles J. Gearhiser, R. Wayne Peters, and Robin L. Miller, Chattanooga, Tennessee, for the Appellee, Estate of Drewry E. Haskins, Jr.

## OPINION

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL PICKENS FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

At his death, Drewry E. Haskins, Jr., owned shares of capital stock in Catoosa Bancshares, Inc. He bequeathed the corporate shares to his son, Joseph M. Haskins, and provided in his will that another son, Drewry Haskins III, should take nothing

from his estate. Drewry Haskins III filed a claim against his father's estate alleging that his father promised him he would receive his father's ownership interest in the corporation upon his father's retirement or death. The trial court determined that Mr. Haskins failed to prove the existence of an oral contract with his father and denied the claim. We hold the trial court did not err and affirm the judgment of the trial court.

## I.   Background

At the time of his death in 1996, Drewry E. Haskins, Jr., owned shares of stock in Catoosa Bancshares, Inc. The Decedent's will left the stock to his son, Joseph M. Haskins, and left nothing to his son Drewry E. Haskins III ("Mr. Haskins").

Mr. Haskins filed a verified claim against the estate, alleging that he was entitled to the stock in Catoosa Bancshares, Inc. based on the oral contract with the Decedent. The verified claim provided that in 1975 or 1976, Decedent's employment with and investment in Capital Bank, then known as Ft. Oglethorpe Bank (the "Bank") was threatened by a takeover attempt. Decedent was unable to secure the financing necessary to enable him to buy enough additional shares of the Bank's stock to fight the takeover. Decedent approached Mr. Haskins and agreed that if Mr. Haskins would apply his resources to purchase enough additional shares of the Bank's stock to fight the takeover, then Decedent, upon ceasing to be actively involved in the Bank's day-to-day business affairs, whether by reason of retirement or death, would transfer Decedent's ownership interest in the Bank to Mr. Haskins. Decedent further agreed that he would not sell, transfer, or otherwise dispose of any of his ownership interest in the Bank before his retirement or death without Mr. Haskins' consent. In

reliance upon the agreement, Mr. Haskins purchased the shares of the Bank's stock needed to fight the takeover attempt. In his verified claim, Mr. Haskins alleged that the Decedent's bequest of the stock in Catoosa Bancshares, Inc. to his brother, Joseph Haskins, was in breach of the oral contract between him and the Decedent.

The case was tried before a special master on August 30 and 31, 1999. The master filed his report with the chancery court on May 15, 2000, finding that Mr. Haskins failed to prove the existence of an oral contract and denying the claim. On March 16, 2004, the chancery court entered an order providing that the master was to consider all of the previously excluded evidence presented at the trial, consisting of the testimony of several witnesses. After considering the previously excluded evidence, the master filed an amended report confirming his previous report. The chancery court confirmed the findings and conclusions of the master, and Mr. Haskins has appealed.

## II.   Issues Presented

The issues presented for our review in this appeal are restated as follows:

1.   Whether the trial court erred in affirming the master's finding that Mr. Haskins did not prove an enforceable oral contract with the Decedent.

2.   Whether the trial court erred in affirming the master's findings of credibility when such findings were reported approximately 56 months after the trial.

3.   Whether the trial court erred in finding that the estate did not waive the Dead Man's Statute and disallowing Mr. Haskins to testify about the alleged transaction with the Decedent.

4.   Whether the trial court erred in granting the estate's motion to strike Mr. Haskins' amended complaint.

### III. Standard of Review

A concurrent finding of fact of the master and chancery court is conclusive on appeal as to those facts, having the same force and effect of a duly-approved jury verdict, except where the finding is on an issue not appropriate for referral, where it is based on error of law or a mixed question of fact and law, or where the factual finding is not based on material evidence. *Aussenberg v. Kramer,* 944 S.W.2d 367, 370 (Tenn.Ct.App.1996); *Archer v. Archer,* 907 S.W.2d 412, 415 (Tenn.Ct.App.1995); *In re Estate of Wallace,* 829 S.W.2d 696, 699–700 (Tenn.Ct. App.1992); *see also* T.C.A. § 27–1–113. Thus, we must affirm the concurrent findings of the master and chancery court if there is any material evidence supporting them. *Id.* Our review of the trial court's conclusions of law is *de novo,* with no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

### IV. Analysis

#### A. Existence of Oral Contract and Credibility of Witnesses

Mr. Haskins' claim that he is entitled to the stock in Catoosa Bancshares, Inc. hinges on his assertion that he and the Decedent had an enforceable oral contract providing that Decedent, at retirement or death, would transfer his stock to Mr. Haskins. A contract generally needs not be in writing in order to be enforceable, unless it is of a kind required by the statute of frauds or other law to be written. *Castelli v. Lien,* 910 S.W.2d 420, 426 (Tenn.Ct.App.1995). A person seeking to enforce an oral contract must prove mutual assent to the terms of the agreement and must also demonstrate that the terms of the contract are sufficiently definite to be enforceable. *Id.* at 426–27; *American*

*Lead Pencil Co. v. Nashville, C. & St. L. Ry.,* 124 Tenn. 57, 134 S.W. 613, 615 (Tenn. 1915); *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n,* 807 S.W.2d 559, 564 (Tenn.Ct.App.1990). Regarding the requirement that a contract, oral or written, be "sufficiently definite" to be enforced, this court has stated as follows:

> It is well established in this jurisdiction that a contract can be expressed, implied, written, or oral, but an enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced. *Johnson v. Central National Ins. Co. of Omaha, Neb.,* 210 Tenn. 24, 356 S.W.2d 277, 281 (Tenn. 1961); *Price v. Mercury Supply Co., Inc.,* 682 S.W.2d 924 (Tenn.App.1984). The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. *Batson v. Pleasant View Utility Dist.,* 592 S.W.2d 578, 582 (Tenn.App.1979); *Balderacchi v. Ruth,* 256 S.W.2d 390, 36 Tenn.App. 421 (1953). In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer." *Talley v. Curtis,* 129 S.W.2d 1099, 23 Tenn.App. 181 (1939).

*Jamestowne on Signal, Inc.,* 807 S.W.2d at 564; *Lay v. Fairfield Development,* 929 S.W.2d 352, 356 (Tenn.Ct.App.1996).

As noted above, Mr. Haskins' claim, in essence, is that in the mid–1970s he agreed to purchase enough stock in Capital Bank (then Ft. Oglethorpe Bank) to help the Decedent, a founder and officer of the Bank, defeat a hostile takeover attempt of the Bank. Mr. Haskins alleges that in re-

turn, the Decedent promised him that at Decedent's retirement or death, he would transfer his ownership interest in the Bank to Mr. Haskins. Mr. Haskins also points to two later events where he alleges the Decedent "reaffirmed" his commitment to transfer the stock to Mr. Haskins. The first was the creation of a holding company for the Bank, Catoosa Bancshares, Inc., in the early 1980s. Mr. Haskins alleges that the holding company would not have been created if not for his support and the voting of his stock shares in favor of its creation.

The second event involved the effort to procure a reverse stock split in an attempt by Decedent and Mr. Haskins to consolidate ownership of the Bank and reduce minority ownership. After the reverse stock split, Mr. Haskins and his father, the Decedent, owned more than 90% of the Bank's stock. In both events, Mr. Haskins supported the Decedent's position and wishes, and Mr. Haskins alleges that on both occasions the Decedent reiterated his promise to transfer his stock to Mr. Haskins at his retirement or death.

The proof heard by the master consisted of the testimony of five witnesses presented by Mr. Haskins, and the deposition testimony of one witness, deceased at time of trial, presented by the estate. Alvin D. Phillips, Sr., a founder and officer of the Bank and a good friend of the Decedent, testified as follows regarding the events that occurred following the discovery of the takeover attempt by Mack Robinson:

A: Mr. Haskins, Jr. [Decedent] told me that he and his eldest son, Drew Haskins III, had discussed the matter and that he was going to—wished to and wanted to and was planning on bringing Drew into the bank because Drew had agreed to bringing the finances that would be necessary to acquire any stock that the stockholders continued to sell and also any that Mr. Robinson, since he had agreed by the fact that he didn't think he could go ahead, he told me, his stock, and that he wanted to bring Drew in not only in a financial way, but they had discussed it and that he would come in to begin to learn the banking business and that at his retirement or death that Drew would be prepared to operate the bank and have the bank.

\* \* \*

Q: What, if anything, did [Decedent] tell you about his plan or his agreement with his son?

A: His agreement was told by me—told by [Decedent] to me and later on discussed with Drew III because I being—myself being interested and part of this thing, let me state this, [Decedent] and I were close from '53, very close in confidential matters until his death almost, and the agreement was that Drew III would be brought into the bank to learn the banking business and at [Decedent's] retirement or at his death Drew III would be in operation and would own the bank and would have the bank.

Mr. Phillips also testified that at Mr. Phillips' request, Decedent orally agreed that he would give Mr. Phillips the right of first refusal to purchase his shares of the Bank if Decedent ever decided to sell them. Mr. Phillips further testified as follows:

Q: What, if anything, did you—did you ever have any conversations with [Decedent] where he told you that he was not going to honor his commitment that the ownership be to [Mr. Haskins] in return for [Mr. Haskins'] helping him?

A: *There was never any conversation of their original plan to me.*

\* \* \*

Q: If the bank had been sold, did you expect that [Decedent] would have hon-

ored his agreement to you that you had the right of first refusal?

A: Yes.

\* \* \*

Q: ... I notice in response to Ms. Lawrence's questions you've been very cautious to try to make her understand the difference between operation and ownership. And there was a difference in [Decedent's] understanding of what would happen with Drew III; was there not?

A: The reason I stated that was *our conversation through the years*—

Q: With [Decedent].

A:—*with [Decedent] that I'm referring to has been basically all operation. Other than a general statement that he would make at times of making his will out and making a new will out or things like that, I did not know anything about ownership.* That's the reason it was operations that we discussed.

Q: And when you talk operations, you mean management of the bank?

A: Correct.

Q: All right. Was there ever any conversation you had with [Decedent] about the ownership of stock or ownership of the bank going from Drew, Jr. only to Drew, III?

A: *We never discussed any manner that it would be disposed of.*

(Emphasis added).

Mr. Haskins also presented the testimony of Dennis Turnbo, a member of the Bank's board of directors. Mr. Turnbo testified that Decedent told him that "because [Mr. Haskins] had helped him in the acquisition of the stock and that they had an agreement, that in the event of his death or his retirement that his son, [Mr. Haskins], would control and own the bank." Mr. Turnbo also testified on four

separate occasions that his understanding of the alleged agreement was that Mr. Haskins would "take over" or "take control" of the Bank, and further stated as follows:

Q: So the Court understands, when you talk about [Decedent and Mr. Haskins] at some point having this agreement, can I understand that that occurred when you came on the board in '87 or so?

A: I mean, that's when I was told about it, yes, sir.

\* \* \*

Q: Did they tell you how the stock was going to be transferred, that [Decedent] was going to sign something over to [Mr. Haskins]?

A: The only thing he told me is that in the event of his death or his retirement that his son would—

Q: His son would?

A: His son would take over the bank.

Q: He didn't say that he was going to sign over anything, just his son would take over the bank, that's the word he used?

A: I mean, he said that they had had an agreement that he would take over the bank in the event of his retirement or death.

\* \* \*

Q: You don't know how much stock was to be transferred, what price, or how it was to be transferred, do you, sir?

A: I just heard that he was supposed to take over the bank.

Mr. Haskins also presented the testimony of Stephanie Ramey, who stated that she had done bookkeeping work for the Decedent, and was currently doing book-

keeping work for Mr. Haskins. Ms. Ramey testified that the Decedent had mentioned to her a number of times over the years that Mr. Haskins would own the Bank. Phyllis Haskins, Mr. Haskins' wife, also testified that the Decedent had said to her that "one day the bank would be his [Mr. Haskins']."

The record reflects that until 1988, Mr. Haskins was actively involved in the operation and management of the Bank. In July of 1988, Mr. Haskins resigned from the Bank's board of directors, a decision which strained his relationship with the Decedent and ultimately resulted in their estrangement. Mrs. Haskins testified that after Mr. Haskins' resignation until Decedent's death in 1996, she visited in Decedent's home only once, and Mr. Haskins was not with her. Mr. Haskins did not visit his father, the Decedent, when he was sick and in the hospital, and did not attend his funeral. As stated, Decedent specifically excluded Mr. Haskins in his will, and bequeathed the Bank stock at issue to Joseph Haskins.

The estate presented the deposition testimony of Michael Callaway, deceased at time of the trial, who was a director of the Bank. Mr. Callaway testified that shortly before Decedent's death, Mr. Haskins approached Mr. Callaway and asked him to speak to Decedent regarding the possibility of selling Mr. Haskins some of Decedent's Bank stock "to help lighten the estate burden." Mr. Callaway further stated that Mr. Haskins called him after Decedent's death and "told me that he was going to bring a case against the estate, that he felt that … there was some stock ownership things and asked me if I knew of any of the stock commitments. I knew of no stock pledges or promises."

The master, after hearing and considering the proof and objections thereto, filed a report on May 15, 2000, in which he concluded as follows:

> The record is replete with comments Claimant [Mr. Haskins] would "own the bank" or "take over the bank" upon Decedent's retirement or death. Such could occur in numerous ways unknown to the record in this action. Evidence is insufficient to support the method Claimant offers, that he had a contract for Decedent's shares … Claimant has failed to carry the burden of proof on the alleged contract.

The master filed an amended report on April 26, 2004, after considering certain portions of the testimony previously ruled inadmissible, pursuant to the chancery court's order entered March 16, 2004. The master affirmed his previous report in the amended report. In addition to finding Mr. Haskins' proof insufficient to prove the alleged oral contract, the master found a number of facts "which point away from the so-called contract": (1) the right of first refusal granted to Decedent's best friend and co-founder of the Bank, Mr. Phillips, in the event Decedent decided to sell his interest in the Bank; (2) Decedent's will and codicil leaving nothing to Mr. Haskins; and (3) "the fact that Claimant [Mr. Haskins] asked bank director Michael Callaway to speak to Decedent regarding possibly selling Claimant some of Decedent's stock."

Mr. Haskins filed his objections to the master's amended report with the chancery court, which in a memorandum opinion and order entered October 18, 2005, upheld some of his objections and overruled others. The chancery court affirmed the master's conclusion that the evidence presented by Mr. Haskins failed to establish the existence of an enforceable oral contract entitling Mr. Haskins to Decedent's shares in the Bank.

On appeal, Mr. Haskins challenges the master's credibility findings regarding the testimony of Stephanie Ramey and Phyllis Haskins. The master specifically found the testimony of each of these witnesses "not to be credible in this action as a result of her affect and her interest." It is well settled that the "weight, faith and credit to be given to any witness' testimony lies in the first instance with the trier of fact and the credibility accorded will be given great weight by the appellate court." *Mays v. Brighton Bank,* 832 S.W.2d 347, 352 (Tenn.Ct.App.1992). The Supreme Court has stated the rationale for the principle of our affording great deference to credibility determinations made by the trier of fact as follows:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett,* 788 S.W.2d 559, 561 (Tenn.1990); *Bowman v. Bowman,* 836 S.W.2d 563, 566 (Tenn. Ct.App.1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn–Tex Properties v. Brownell–Electro, Inc.,* 778 S.W.2d 423, 425–26 (Tenn.1989); *Mitchell v. Archibald,* 971 S.W.2d 25, 29 (Tenn.Ct.App.1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315, 315–16 (Tenn.1987); *Bingham v. Dyersburg Fabrics Co., Inc.,* 567 S.W.2d 169, 170 (Tenn.1978).

*Wells v. Tennessee Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn.1999).

Mr. Haskins argues that "the Special Master made a determination of credibility of multiple witnesses ... *fifty-six months after hearing.* It is respectfully submitted that no finder of fact can make any appropriate finding of credibility more than four and one-half years after the hearing in question." (Emphasis in original). We disagree with this argument for several reasons. First, Mr. Haskins is essentially asking this court to create a new standard of review, abandoning our deference to the trier of fact's credibility determinations when a certain (unspecified) length of time has elapsed after the hearing. While the length of time that elapsed in this case between the hearing and the master's final amended report presents a less than optimal situation, the reasons for affording deference to his credibility findings remain undiminished. The master was still the trier of fact who saw and heard the witnesses in person. Second, the master's credibility assessments were not *made* 56 months after the hearing, as Mr. Haskins argues. The assessments were made at the time of the hearing; but they were not contained in the master's initial report because of his rulings on admissibility and not *reported* to the chancery court until later.

Mr. Haskins argues that "ordinarily, the testimony of a witness who is not contradicted, impeached or discredited must be accepted as true," citing *Gleason v. Prudential Fire Ins. Co.,* 127 Tenn. 8, 151 S.W. 1030 (Tenn.1912) and *Frank v. Wright,* 140 Tenn. 535, 205 S.W. 434 (Tenn.1918) in support of this argument. However, the Supreme Court has stated at least twice that "no rule of evidence, of which we are aware, requires the court to arbitrarily accept the testimony of an interested witness, although not directly impeached, when from a consideration of all the evidence a different conclusion is reached from that testified to by such witness." *Carter v. Kelsey Wheel Co.,* 168 Tenn. 262, 77 S.W.2d 449, 450 (Tenn.1935); *Reedy v. Mid–State Baptist Hosp.,* 210

Tenn. 398, 359 S.W.2d 822, 823 (Tenn. 1962). We find Mr. Haskins' argument challenging the master's credibility assessments to be without merit.

Considering the record and the evidence presented as a whole, we affirm the trial court's ruling that Mr. Haskins failed to meet his burden to prove the existence of the alleged oral contract. As the trial court noted, the testimony of Mr. Phillips on this issue was "at best confusing, at worst conflicting." The testimony, including that of Mr. Phillips and Mr. Turnbo, tended to show that the Decedent frequently had made comments indicating that it was his intention, or his aspiration, that his son Mr. Haskins would "succeed" him at the Bank, or that he would "take over" someday. But there is little evidence supporting the allegation of an executed and enforceable oral contract, and, as the master found, significant evidence suggesting there was no such contract.

### B. Dead Man's Statute

■ Next Mr. Haskins argues that the trial court should have held that the estate waived the application of the Dead Man's Statute, and therefore should have allowed Mr. Haskins to testify about the alleged transaction with Decedent. The Tennessee Dead Man's Statute provides in relevant part as follows:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.

T.C.A. § 24–1–203.

At trial, during Mr. Haskins' direct testimony, the estate objected to his counsel's questioning about Mr. Haskins' stock ownership in the Bank and how he acquired it, citing the Dead Man's Statute. The master overruled the objection, allowing the inquiry into when and how Mr. Haskins acquired the stock, and how he voted his shares on certain issues such as the creation of the holding company and the reverse stock split. On cross-examination, counsel for the estate elicited the following testimony, prompting Mr. Haskins' argument that the estate "opened the door" and waived the Dead Man's Statute by inquiring about the alleged transaction:

Q: What were the other percentages of ownership in Capital Bank prior to the formation of the holding company?

A: I couldn't tell you that. A stock register would have to reflect that.

Q: Well then, how do you know, since you've testified under oath that your percentage of stock was necessary for the formation, if you don't know the other percentages?

A: My father and I had discussions on this. He came to me and told me what percentage of stock he had. He added to it what percentage was controlled by the board of directors, the existing board of directors. He went down the stockholders list and checked off specific names, showing me which people in the community he could count on to vote with and then indicated to me how much I would need to buy to prevent J. Mack Robinson from taking over the bank.

Q: That was in 1974 and '75. I'm talking about the formation of the holding company. Your testimony has been that that formation could not have occurred without you voting your stock. That's what you testified to?

A: Of the holding company?

Q: Yes, sir.

A: Yes, sir, I did testify to that.

Q: And you only owned 5 percent at that time?

A: No, not at that time.

Q: How much did you own?

A: I think at that time we must have owned—

Q: No, I'm talking about you, individually.

A: Well, I had transferred within my family—part of our agreement was for this to go to my children, so I was transferring stock to my children, and I was either—either I or my wife was the guardian for those children, so we voted those shares on their behalf. We owned, probably at that time, about 15 or 16 percent of the stock.

We are of the opinion that these questions about the percentages of ownership of stock in the Bank were not inquiries into the alleged transaction with the Decedent, nor about statements made by the Decedent. As can be seen, Mr. Haskins' answers were not entirely responsive to the questions, in that he interjected unsolicited and unresponsive information about the alleged transaction in his responses.

▪ Further, the general rule applies in this case that "where transactions with the decedent are first developed on direct examination over objections of representatives of the decedent, the objections are not waived by subsequent cross-examination relative to the transactions testified to on direct examination." *Nabors v. Gearhiser*, 525 S.W.2d 145, 148 (Tenn.1975); *Leffew v. Mayes*, 685 S.W.2d 288, 293 (Tenn.Ct.App.1984); *accord* Cohen, Sheppeard & Paine, TENN. LAW OF EVID. (5th ed.) § 6.01[5][j]. We hold that the trial court did not err in finding that the estate did not open the door and waive the applicability of the Dead Man's Statute under the circumstances of this case.

### C. Amendment of Complaint

▪ Finally, we address Mr. Haskins' argument that the trial court erred in granting the executor of the estate's motion to strike "all claims against Joseph Haskins, individually and as Trustee, and all prayers for relief affecting Joseph Haskins' rights either individually or as Trustee, from the amended complaint[.]" A brief discussion of the procedural history regarding the motion to amend the complaint is helpful to the resolution of this issue. As previously stated, Mr. Haskins filed his claim against the estate on October 15, 1996. On April 28, 1997, Mr. Haskins filed a motion to amend his complaint, with the proposed amended complaint attached as an exhibit. It appears that Mr. Haskins filed the same amended complaint in two separate but related cases, both in Hamilton County Chancery Court, because the document's heading contains the styles and docket numbers of both actions. The amended complaint proposed to add causes of action brought by Mr. Haskins by and on behalf of his minor children; sought to add Joseph M. Haskins individually as a party defendant; and alleged that by virtue of Mr. Haskins' agreement to purchase shares in the Bank in order to defeat the Robinson takeover attempt, a partnership had been created between Mr. Haskins and Decedent, and that Mr. Haskins was entitled to "not less than 50% of the assets of the partnership, i.e., 50% of the Decedent's shares in Capital Bank and/or Catoosa Bancshares, Inc." The estate filed a brief opposing the motion to amend, arguing that it was not timely filed.

More than two years later, Joseph M. Haskins, acting in his capacity as executor of the estate, filed an answer to the proposed amended complaint on June 25, 1999. The case was heard by the master on August 29 and 30, 1999, at which point no action had been taken by the trial court on Mr. Haskins' motion to amend his complaint. On May 25, 2001, the executor filed a motion to strike "all claims against

Joseph Haskins, individually and as Trustee, and all prayers for relief affecting Joseph Haskins' rights either individually or as Trustee, from the amended complaint[.]" The trial court granted this motion on August 15, 2001, finding that it had never "allow[ed] the claim of Drewry Haskins, III, to be amended to add parties nor to add claims as the time had expired for any parties to be added or [to] add claims." The trial court struck the proposed amended complaint because "it was filed without leave of Court and because it is barred by Tenn.Code Ann. § 30–2–307," and struck the answer to the amended complaint as surplusage.

In 2005, the Tennessee General Assembly established time lines for amending a claim against an estate and imposed additional restrictions to amending a claim after the deadline to file a claim against an estate has passed with the enactment of T.C.A. 30–2–307(e).[1] *In re Estate of Dukes,* No. M2004–00340–COA–R3–CV, 2006 WL 468721, at *5 (Tenn.Ct.App.M.S., Feb. 27, 2006). In this case, Mr. Haskins attempted to file his amended complaint before T.C.A. 30–2–307(e) became effective, and so we apply the law in effect prior to the 2005 amendment. *Id.* The *Dukes* court, presented with an identical situation, restated the law in this regard as follows:

> Our courts have historically permitted a party to amend a claim after the filing deadline passed provided the amendment does not introduce a "new cause or a new party." *Cooper's Estate v. Keathley,* 27 Tenn.App. 7, 177 S.W.2d 356, 359 (Tenn.1943) (holding that an amendment

which does not introduce a new cause or a new party relates back to the beginning of the suit). *Keathley* evidences a liberal policy for allowing amended claims against estates to relate back to the original timely filed claim. A "new cause of action" is generally found where a new set of facts are introduced out of which liability arises or new parties are introduced. *Whitson v. Tennessee Cent. Ry. Co.,* 163 Tenn. 35, 40 S.W.2d 396, 397 (Tenn.1931); *see also Link v. Southeastern Greyhound Lines,* 198 Tenn. 262, 265, 279 S.W.2d 259, 260; *McCleary v. Morgan,* 60 Tenn.App. 578, 449 S.W.2d 440, 446 (Tenn.Ct.App.1968).

*Dukes,* 2006 WL 468721, at *6.

In the present case, Mr. Haskins sought to amend his complaint to add new parties: his minor sons as plaintiffs, and Joseph Haskins individually as a defendant. The trial court correctly held that the attempt to amend his complaint in this regard was untimely. "The granting or denying of a motion to amend is within the sound discretion of the trial court and will be reversed only for an abuse of discretion." *March v. Levine,* 115 S.W.3d 892, 908 (Tenn.Ct.App.2003); *Merriman v. Smith,* 599 S.W.2d 548, 559 (Tenn.Ct.App. 1979). We do not find that the trial court abused its discretion in striking the motion to amend under the circumstances of the present case.

### V. Conclusion

For the aforementioned reasons, we affirm the judgment of the trial court.

---

1. "A creditor who has timely filed a claim against the estate shall file any amendment to its claim no later than thirty (30) days from the later of: (A) The date an exception to the claim is filed; or (B) The expiration of the exception period." The 2005 amendment further provides: "Unless the court with jurisdiction over the probate of the decedent's estate grants an extension of time for amendment on the creditor's showing of extraordinary circumstances, any amendment filed after the time prescribed shall be void." T.C.A. § 30–2–307(e)(2).

Costs on appeal are assessed to the Appellant, Drewry E. Haskins III.