IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 7, 2023 Session

## JULIE CLARK v. WANDA GIVENS,[1] ET AL.

**Appeal from the Circuit Court for Dickson County**
**No. 2017-CV-50     Larry J. Wallace, Judge**

_____

**No. M2022-00341-COA-R3-CV**
_____

A homeowner, displeased with the work performed by a handyman, brought suit, seeking damages and relief under the Tennessee Consumer Protection Act. The handyman counterclaimed for the value of the oral contract for services, asserting the homeowner breached the contract by improperly terminating it. The circuit court denied relief to both parties, and the parties appeal. We conclude that the circuit court did not err in determining that there was no enforceable contract, precluding relief for the handyman. Likewise, the homeowner is not entitled to relief because the evidence does not preponderate against the circuit court's finding that there was no misrepresentation and that the handyman rendered services to earn certain prepaid amounts. The judgment of the circuit court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Julie Clark, White Bluff, Tennessee, Pro Se.

George E. Copple, Brentwood, Tennessee, for the appellee, Jeffrey Givens.

### OPINION

### I.

This case concerns an alleged oral contract between Dr. Julie Clark, a veterinarian

---

[1] Wanda Givens has twice been dismissed from the lawsuit, and the dismissal has not been appealed. Jeffrey Givens remains a party on appeal.

seeking home repair services, and Jeffrey Givens, a handyman. Dr. Clark asserts that Mr. Givens, who had sustained a prior workplace injury, was unable to complete the work contemplated by the contract. She also asserts that the quality of work Mr. Givens did perform was substandard and that Mr. Givens and his wife, Wanda Givens, misrepresented Mr. Givens's abilities to Dr. Clark in order to induce her to enter the contract. Mr. Givens, on the other hand, asserts that he was at all times willing and able to perform the work contemplated, that Dr. Clark breached the contract by unilaterally terminating it and assigning the work to others, including Dr. Clark's son-in-law, and that he is entitled to any payments he would have received under the contract.

The proof at trial showed that Dr. Clark had purchased a new home and was preparing to sell her prior residence. As part of the contemplated sale, she intended to procure certain home renovations, including painting the interior of the home. Dr. Clark became aware that Mr. Givens had built some cabinets at her grandson's daycare, where Ms. Givens was the director. On inquiry, Ms. Givens told Dr. Clark that Mr. Givens was capable of doing the contemplated work. Specifically, she told Dr. Clark that Mr. Givens was a jack-of-all-trades and that "[h]e can do anything." Ms. Givens did not mention Mr. Givens's prior severe workplace injury. At trial, she explained this omission by testifying, "That wasn't part of the question. I didn't think about that. . . . I just said he was able to do the jobs." She elaborated, "It's not that I was trying to hide it. I don't know why I didn't say [anything] up[ ]front. I know what he's capable of. I know what he can do." While acknowledging that she had not mentioned Mr. Givens's injury, Ms. Givens testified that she did not think the injury was pertinent because she believed Mr. Givens could perform the required work. Ms. Givens testified that "I didn't think at the time that it would bother him to do [the] job," and stated that she knew "what he's capable of and I knew he could paint with his right hand." Ms. Givens insisted, "If he couldn't paint, I would tell her he couldn't paint. I knew he was capable of that. Yes, he could do that."

Dr. Clark contacted Mr. Givens to inquire about having him do the work she contemplated at her old house. Initially, Mr. Givens performed some plumbing work at the old house and some minor repairs at Dr. Clark's new home. Mr. Givens performed this work to her satisfaction, and he was paid. According to Dr. Clark, the man who was doing tile work in the bathroom said Mr. Givens did a "great job" on the plumbing.

Accordingly, Dr. Clark asked Mr. Givens to come to the house on January 14, 2016, so that they could discuss the desired improvements. Dr. Clark testified that she asked Mr. Givens about painting, and he told her that he was "a great painter" and that he had "done lots of painting." Like Ms. Givens, Mr. Givens did not mention his prior workplace injury. He testified he did not feel that he had to inform Dr. Clark because, "As long as I was doing my job and doing what I was supposed to be doing, then, no there's no problem with it." Asked directly why he neglected to inform Dr. Clark about his injury, he stated, "Ma'am, if I would have told you, you wouldn't [have] hired me." Mr. Givens, in confirming that he did not mention his injury when he was hired, also testified, "I'm not trying to sound

ugly, but are you saying that disabled people cannot work?" Considered in the context of his entire testimony, the statement that Dr. Clark would not have hired him was not understood by the trial court as an admission that he could not perform the work but instead appears to have been understood by the trial court as an expression of Mr. Givens's fear that others might harbor unfair negative perceptions about persons with disabilities. Mr. Givens testified that he was physically capable of completing all the tasks required by the contract. Mr. Givens testified that he was self-taught as a painter and that he started painting as a means of earning income through odd jobs after he was injured.

While both Mr. and Ms. Givens testified that, when they spoke to Dr. Clark, they believed that Mr. Givens could perform the work, Dr. Clark introduced their deposition testimony from a workers' compensation case regarding the severity of Mr. Givens's injury. Ms. Givens had testified in September 2015 that Mr. Givens was injured in 2011, that he could not lift, pull, or push with his left arm after surgery, and that he used the arm as a "prop." She stated that Mr. Givens had not held a regular job since 2011 but that he had made cabinets for her daycare and done other odd jobs, with assistance. Mr. Givens had testified in July 2014 that he had nerve damage in his arm, three to four severe headaches a week, and problems with the vision in his left eye. He testified in his deposition that he had not been able to use his left arm at all since the injury but that he had done some work with some assistance.

Dr. Clark and Mr. Givens both testified that they entered into a contract on January 14, 2016, for Mr. Givens to perform renovations. However, they disagreed on the scope of work included in the contract and the amount to be paid. According to Dr. Clark, the contract entailed four tasks: painting the home for $8,500; removing and repairing kitchen cabinets for $400; stripping, priming, and painting cabinets for $675; and replacing bathroom countertops for $200. Dr. Clark testified that she agreed to pay Mr. Givens $9,775 total for these tasks, which were bid discretely. Dr. Clark testified that she solicited bids from Mr. Givens on other projects, but that she did not hire him to complete these projects. Dr. Clark took extensive notes related to the oral contract, and she used her notes to prepare her testimony. Mr. Givens, on the other hand, testified that the contract included not only the tasks listed by Dr. Clark but also other projects, specifically pressure washing the driveway and garage floor, painting the garage floor with epoxy, and painting and replacing handrails on the porch. According to Mr. Givens, the contract was not broken down into discrete tasks but was instead indivisible. He testified that he bid $11,575 to perform as a single project all of the work that the parties discussed.

Dr. Clark and Mr. Givens also disagreed on the discussed timeframe for completing the work. Dr. Clark testified that Mr. Givens was to be finished with the projects in two weeks, although she agreed that she did not tell Mr. Givens that time was of the essence. Mr. Givens testified he told Dr. Clark it would take "four weeks or better with one person." In response to an inquiry connected with an interrogatory in which he had stated the timeframe was six weeks, Mr. Givens stated that he had told her four to six weeks. He

then said he had told her it would be about six weeks. Later in his testimony, Mr. Givens stated that the six-week estimate was just for painting the inside of the house. Mr. Givens ultimately testified that he believed the contract was for tasks to be performed and that he understood that he could take as much time as necessary to do a good job.

Dr. Clark gave Mr. Givens $2,500 at the time they entered into the contract. According to Dr. Clark, she checked on Mr. Givens's progress approximately two weeks later, on January 27, 2016, and expressed concern at the lack of progress. Dr. Clark testified she first learned of Mr. Givens's injury on this date, when he disclosed that he had not made more progress because he was beset by pain and headaches and had been attending appointments with his doctors and lawyers. Mr. Givens assured her he would make rapid progress and, "on the verge of tears," asked her for more money. Mr. Givens disputes Dr. Clark's testimony, indicating that on January 27th, Dr. Clark had told him that "[e]verything was looking good." The parties agree Dr. Clark gave Mr. Givens an additional $2,000 on January 27, 2016.

Dr. Clark testified that on February 2, 2016, she again expressed concern about Mr. Givens's slow progress and also regarding the quality of some of the painting. According to Dr. Clark, she told Mr. Givens she would hire someone else if he did not make substantial progress in the coming week. Dr. Clark testified that Mr. Givens had not made progress by the 9th and that she hired a new painter on February 15th. According to Dr. Clark, Mr. Givens told her he had worked twenty-five hours and that he made $30 an hour, and she believed that, with the money he spent on supplies, he was entitled to $1350 out of the $4,500 she had paid him. She stated that, initially, he agreed that he would finish work on the cabinets to earn more of the money she had already paid but that he did not complete the work. Dr. Clark testified that some of the work completed by Mr. Givens was substandard and had to be redone. Specifically, she said that the cabinets were improperly prepared and had to be repainted and that the walls had to be repainted because Mr. Givens had chosen the wrong sheen of paint. Mr. Givens, on the other hand, testified that Dr. Clark never gave him notice of any defects. He was adamant that he would have been able to finish the job if he had been given the opportunity to do so. Mr. Givens testified that Dr. Clark was incorrect about the time he spent, his hourly rate, and the amount he spent on materials. Mr. Givens gave his own estimate of the work he had performed, testifying that he spent sixty to seventy hours on the work and between $900 and $1,000 in materials. Asked how much he would have charged if he had bid the project by the hour, Mr. Givens stated that the normal amount for a painter was $55 to $60 per hour.

Dr. Clark terminated the contract. She asked the Givenses to return any funds she had disbursed above what Mr. Givens had earned, but no funds were returned.[2] Dr. Clark filed suit against the Givenses in general sessions court for $3,700, and the Givenses

---

[2] Ms. Givens's testimony touched on harassment in connection with Dr. Clark allegedly repeatedly contacting Ms. Givens's supervisor and threatening to picket the daycare regarding the outstanding funds.

- 4 -

asserted counter-claims. The general sessions court entered judgment in favor of Mr. Givens[3] in the amount of $5,075. Dr. Clark appealed to the circuit court, asserting that Mr. and Ms. Givens misrepresented Mr. Givens's abilities and seeking $4,500 in damages and treble damages under the Tennessee Consumer Protection Act (TCPA). The Givenses asserted that Dr. Clark breached the contract by terminating it and that Mr. Givens was entitled to the amount he would have been paid under the contract.

The circuit court, finding that there was a mutual mistake between the parties as to the time of completion, concluded that the contract should be rescinded. The court further concluded that Mr. Givens was entitled to the value of the work he had performed. Basing its calculations on Mr. Givens's testimony as to hourly rate, the number of hours expended, and the cost of supplies, the court awarded Mr. Givens $4,500, which was the same amount he had previously been paid by Dr. Clark. The court held that any additional claims were without merit, and it dismissed Ms. Givens from the suit on the basis she had not been a party to the contract.

Both parties appealed. In these parties' first appeal, this court concluded that "the trial court's decision to rescind the parties' oral contract and dismiss the case due to a 'mutual mistake' was reversible error." *Clark v. Givens*, No. M2019-01693-COA-R3-CV, 2020 WL 4382247, at *5 (Tenn. Ct. App. July 30, 2020). This Court reasoned that there was nothing in the contract to indicate time was of the essence and that any mistake as to time of completion was accordingly not material. *Id.* This court remanded with instructions for the trial court to make findings of fact and conclusions of law on the remaining claims.[4] *Id.*

On remand, the trial court referred the parties to mediation, which was unsuccessful. The trial court entered an order after the unsuccessful mediation. The order was substantially similar to the 2019 order; however, instead of relying on mutual mistake as to the time of completion, the trial court relied on mutual mistake as to material contract provisions, "specifically the monetary terms (nearly $2,000.00 difference) as well as to the lack of agreement on all the tasks to be performed." The order elaborated that "[t]he Court rules that there was never a meeting of the minds between Dr. Clark and Mr. Givens regarding the monetary contract terms and all the tasks to be performed." It further explicitly found that all the parties were credible and "their observations and perceptions were just inconsistent with one another"; that there had been "no misrepresentation that occurred by any of the parties"; and that the TCPA did not apply because there were no misrepresentations. The court noted that Mr. Givens testified that he could have completed

---

[3] Claims asserted by Ms. Givens were dismissed by the general sessions court.

[4] Dr. Clark filed a petition to rehear, highlighting a typographical error, which was corrected. The petition was denied insofar as it asserted that the opinion conflicted with the Tennessee Consumer Protection Act, that it improperly omitted the Act, or improperly focused on the oral contract. *Clark v. Givens*, No. M2019-01693-COA-R3-CV (Tenn. Ct. App. August 28, 2020) (order).

the tasks given more time but that he was not permitted to do so. The trial court once more concluded that Mr. Givens was entitled to $4,500 for work performed, essentially leaving the parties in the same positions they had occupied prior to the suit. The order again dismissed Ms. Givens from the suit.

Dr. Clark, proceeding pro se, asserts various errors. She contends that the trial court erred in finding there was no misrepresentation, arguing that there were discrepancies between the Givenses' statements that Mr. Givens was capable of completing the work and their testimony in the workers' compensation case regarding severe disability. Dr. Clark also objects to the trial court's decision to credit Mr. Givens's testimony regarding the value of the work he had completed rather than relying on her testimony, which was based off contemporaneous notes. She argues that the trial court erred in rescinding the contract because Mr. Givens would not have been able to perform the work even if the parties had agreed on the terms. She also asserts that the TCPA applies to her claim and that courts are abdicating their role and violating her due process rights by refusing to grant her relief under the TCPA. Mr. Givens responds that the contract was a bid for the entire project, that it was not severable, and that he is entitled to damages for Dr. Clark's breach. He insists that the trial court rescinded the contract based on the parties' failure to agree on a time for completion, and he focuses on arguing that the timing of completion was not a material term of the contract.

II.

A trial court's findings of fact in a civil action are reviewed de novo on the record, accompanied with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Lovlace v. Copley*, 418 S.W.3d 1, 16 (Tenn. 2013). Questions of law are reviewed de novo with no presumption of correctness. *Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 142 (Tenn. 2017). The interpretation of a contract is a question of law reviewed de novo. *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004). Likewise, "[t]he determination of whether a contract has been formed is a question of law." *Cadence Bank, N.A. v. The Alpha Tr.*, 473 S.W.3d 756, 773 (Tenn. Ct. App. 2015) (quoting *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009)).

Dr. Clark is proceeding pro se in this appeal.[5] Pro se litigants "are entitled to fair and equal treatment by the courts." *Vandergriff v. ParkRidge E. Hosp.*, 482 S.W.3d 545, 551 (Tenn. Ct. App. 2015). Courts should be mindful that pro se litigants often lack any legal training and many are unfamiliar with the justice system. *State v. Sprunger*, 458 S.W.3d 482, 491 (Tenn. 2015). Accordingly, courts should afford some degree of leeway in considering the briefing from a pro se litigant, *Young v. Barrow*, 130 S.W.3d 59, 63

---

[5] Dr. Clark was briefly represented by counsel below, but litigated pro se for the bulk of the proceedings, including on appeal before this court.

(Tenn. Ct. App. 2003), and should consider the substance of the pro se litigant's filing. *Poursaied v. Tenn. Bd. of Nursing*, 643 S.W.3d 157, 165 (Tenn. Ct. App. 2021). Pro se litigants, however, may not "shift the burden of litigating their case to the courts." *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000). Additionally, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010). It is imperative that courts remain "mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003).

### III.

Turning to Dr. Clark's arguments, we first address her challenges to the court's factual findings. Pointing to inconsistencies between the testimony of the Givenses at trial and their deposition testimony, Dr. Clark asserts the circuit court "erred by failing to follow the rule of law" by finding that there was no misrepresentation. In what we understand as a related contention, she asserts that the trial court "exhibited extreme bias[6] and undue deference toward the testimony of Mr. Givens as opposed to the testimony of Dr. Clark" on the issue of damages. Both of these arguments amount to a challenge to the circuit court's credibility determinations and related factual findings.

"One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations." *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). As stated by the Tennessee Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012).

In this case, Dr. Clark takes issue with the circuit court's determination that the Givenses were credible, contending that their deposition testimony demonstrates that they were not credible witnesses. Dr. Clark further contends that the deposition testimony illustrates that the Givenses' failure to disclose the injury was intentional misrepresentation. The circuit court, however, found that "all parties testifying were credible." While the Givenses' deposition testimony certainly stated that Mr. Givens's injury had prevented him from having a full-time job and that he had extremely limited use

---

[6] Dr. Clark has not sought recusal of the trial court judge either through the proper procedure or otherwise. Nor is there any apparent basis for recusal that emerges from the record in the present case.

- 7 -

of his arm, both Mr. and Ms. Givens stated in their depositions that he was doing some carpentry work and other "odd jobs." The record demonstrates that, after the injury, Mr. Givens successfully built cabinets for the daycare, performed minor home repairs at Dr. Clark's new home, and did a "good job" in rerouting the plumbing for the bathtubs. Mr. Givens testified that painting was among the "odd jobs" he began to perform after the injury. The Givenses both testified at trial that they did not believe the injury rendered Mr. Givens unable to complete the work Dr. Clark was requesting. Insofar as there is any conflict between the Givenses' trial testimony and their deposition testimony, the circuit court apparently found their trial testimony credible.

An unfair or deceptive act or practice under the TCPA can include an omission, but the omission must be material. Tenn. Code Ann. § 47-18-104(a) (forbidding "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce."); *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) ("A deceptive act or practice is, in essence, 'a material representation, practice or omission likely to mislead ... reasonable consumer[s]' to their detriment." (quoting *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997))). Both Mr. Givens and Ms. Givens testified Mr. Givens was capable of performing the work that he claimed to be able to perform. The trial court found Mr. and Ms. Givens credible and concluded that there was no misrepresentation that he, in fact, could perform the work that he claimed to be able to perform. The record here does not provide clear and convincing evidence to contradict the court's credibility ruling upon which this determination stands, nor does the evidence preponderate against the trial court's factual findings. Under the facts of this case, we would be overstepping our role and improperly intruding into the province of the trial court by overturning its considered judgment in determining that no material misrepresentation was made. We address Dr. Clark's TCPA claim in greater detail below.

Dr. Clark also objects that the trial court chose to credit Mr. Givens's testimony regarding damages, asserting that her testimony based on written notes should have been given more weight. However, there was evidence at trial, namely Mr. Givens's testimony, from which the court could have concluded that Mr. Givens had done more hours of work and that he charged a higher hourly rate than was reflected in Dr. Clark's notes. The court chose to credit Mr. Givens over Dr. Clark after having seen the live testimony. As with the question of misrepresentation, based upon the record before us, we would be overstepping our role by second-guessing this considered determination reached by the trial court.

IV.

Both parties assert error in the court's rescission of the contract. Mr. Givens contends the trial court erred by finding a mutual mistake based upon the absence of a time is of the essence provision in the parties' agreement. This issue was settled, favorably for Mr. Givens, in the first appeal. Mr. Givens is plainly incorrect, however, in his description

of the trial court's ultimate ruling on remand. The trial court's ruling on remand is responsive to this court's remand order. The circuit court stated: "The Court finds that the contract should be rescinded due to the mutual mistake of fact by Dr. Clark and Mr. Givens regarding the material contract provision, specifically the monetary terms (nearly $2,000.00 difference) as well as to the lack of agreement on all the tasks to be performed." The court also based its decision on the determination that "there was never a meeting of the minds between Dr. Clark and Mr. Givens regarding the monetary contract terms and all the tasks to be performed." Mr. Givens's contention that the trial court errantly ruled that a mutual mistake exists due to the absence of a "time is of the essence" provision simply does not appear anywhere in the trial court's final order on remand. Accordingly, we find Mr. Givens's argument to be without merit.

Dr. Clark argues that there was no mutual mistake and that any mistake made by Mr. Givens as to the scope of the work was not material because Mr. Givens was incapable of completing the work. We conclude that the circuit court did not err in concluding that the parties lacked an enforceable contract that permitted them to obtain the recovery they each sought. Even if we assume arguendo that the parties are correct that there was no mutual mistake in the present case to allow for contract rescission,[7] the trial court still

---

[7] In the context of contract reformation, the Tennessee Supreme Court explained that "[m]utual mistake 'is a mistake common to all the parties to the written contract or the instrument or in other words it is a mistake of all the parties laboring under the same misconception.'" *Trent v. Mountain Com. Bank*, 606 S.W.3d 258, 263 (Tenn. 2020) (quoting *Collier v. Walls*, 369 S.W.2d 747, 760 (1962)). Addressing mutual mistake in the context of contract rescission, this court has observed that "[i]n order to authorize relief for mistake the mistake generally must have been mutual, and it must have been material, and not due to the complainant's negligence; and complainant must show injury." *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 632 (Tenn. Ct. App. 2002) (quoting *Robinson v. Brooks,* 577 S.W.2d 207, 208 (Tenn. Ct. App. 1978)). Courts and commentators have both offered differing descriptions of the intersection between meeting of the minds and mutual mistake. *See, e.g.*, *Kishter v. Seven Cts. Cmty. Ass'n, Inc.*, 626 A.2d 993, 996 (Md. 1993) (quotation omitted) (indicating that "equity has jurisdiction to reform a written instrument 'where there has been a mutual mistake—that is, where there has been a meeting of the minds—and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto.'" (quoting *Moyer v. Title Guar. Co.*, 177 A.2d 714 (Md. 1962)); *Bouchard v. Blunt*, 579 A.2d 261, 263 (Me. 1990) (observing that "[p]arties may be relieved from the obligations imposed by contract upon the ground of a mutual mistake of fact that concerns a material element of the contract. Such a mutual mistake precludes a meeting of the minds on all the material elements of the contract."); Joy T. Carmichael, 6 N.C. Index 4th Contracts § 43 (2023) (indicating that "there can be no contract without a meeting of the minds, and in circumstances where there is mutual mistake, the requisite 'meeting of the minds' does not occur" (quoting *Creech v. Melnik*, 495 S.E.2d 907, 912 (N.C. 1998)); John J. Dvorske et al., 16 Ind. Law Encyc. Insurance § 75 (2023) (observing that "where there is a mutual mistake, that is, where there has been a meeting of the minds, an agreement actually entered into, but the document in its written form does not express what the parties actually intended"). The Nebraska Supreme Court noted a distinction between mutual mistake in the context of contract reformation versus rescission:

> For purposes of reformation, a mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written

properly determined that there no agreement on essential terms of the contract in this case. Accordingly, there is no basis under the circumstances of the present case for either party to prevail upon a breach of contract claim.

To prove a claim for breach of contract, a claimant must show: (1) the existence of a valid contract, (2) nonperformance of the contract amounting to a breach, and (3) damages caused by the breach. *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). A contract can be express, implied, written, or oral. *Power Equip. Co. v. England*, 307 S.W.3d 756, 759 (Tenn. Ct. App. 2009). "While oral contracts are enforceable, persons seeking to enforce them must demonstrate (1) that the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable." *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002); *see In re Estate of Haskins*, 224 S.W.3d 675, 678-79 (Tenn. Ct. App. 2006) (noting that a contract must "result from a meeting of the minds and must be sufficiently definite" (quoting *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)). "If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Cadence Bank, N.A.*, 473 S.W.3d at 774 (quoting *Peoples Bank of Elk Valley v. ConAgra Poultry Co.,* 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991)). "In determining mutuality of assent, courts must apply an objective standard based upon the parties' manifestations." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005). "[T]he existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined . . . not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances." *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 675 (Tenn. Ct. App. 2007) (quoting *Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994)). An ambiguous course of dealing from which different inferences regarding the contract can be reasonably drawn is not sufficient to accomplish a meeting of the minds or mutual assent. *In re Estate of Haskins*, 224 S.W.3d at 678 (citing *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)).

---

form does not express what was really intended by the parties. . . .

Rescission, in contrast, may be granted where the parties have apparently entered into a contract evidenced by a writing, but owing to a mistake, their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them.

*In re Est. of Wiggins*, 992 N.W.2d 429, 435–36 (Neb. 2023). The classic illustration of mutual mistake interfering with contract formation is *Raffles v. Wichelhaus*, 2 H & C 906, 159 Eng. Rep. 375 (Ex. 1864), better known as the Peerless case, which involved an agreement to purchase cotton that was to be shipped from India to England via the ship the Peerless, where there were two ships so-named traveling at different times. We need not delve into Tennessee law to determine whether this qualified as a mutual mistake. It is unnecessary to do so because, irrespective of whether the trial court erred in finding a mutual mistake in the present case, there was no meeting of the minds allowing for contract enforcement.

While the parties need not share an identical view of the connotations of a contract, there must be "a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy." Restatement (Second) of Contracts § 20 Cmt. b (1981). A contract is not formed unless the terms are reasonably certain. *See Jamestowne*, 807 S.W.2d at 564.

> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

*Id.* (quoting Restatement, Contracts 2d § 33). In *Jamestowne*, this court concluded that a contract was not enforceable because it lacked the essential terms of a loan, "such as the amount to be loaned, the duration of the loan, how it was to be repaid, the rate of interest to be paid and when, [and] what security, if any, was to be given." *Id.* at 564-65; *see Lay v. Fairfield Dev.*, 929 S.W.2d 352, 355-56 (Tenn. Ct. App. 1996) (terms of the alleged contract were not definite when there was "no evidence in the record to establish the time period during which [a party] would be entitled to a commission, duration of the contract or evidence relating to the sale of other property").

In *Acuff v. Baker*, this court concluded that there was no meeting of the minds between the parties in regard to an estate sale contract. No. W2018-00687-COA-R3-CV, 2019 WL 211922, at *14-16 (Tenn. Ct. App. Jan. 16, 2019), *perm. app. denied* (Tenn. May 16, 2019). In particular, although the parties had orally agreed on a base fee and fifteen percent of sales, there was no agreement on other essential terms, "such as: extra costs for cleaning and preparing the houses; costs of transporting items and labor for loading and unloading; how and by whom the antiques would be appraised; minimum prices for items in the sale; security issues; responsibility for lost, damaged or stolen items; how sales would be logged; disposal of remaining items; timeline for payment of sale proceeds; and whether there would be any guarantee on the sale numbers." *Id.* at *14. Likewise, in *Castelli v. Lien*, the parties did not come to an agreement regarding essential terms. 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995). In particular, they disagreed regarding whether the decorator's fee included contracting, painting, and furnishings and wall coverings or whether these were to be paid separately. *Id.* This court concluded that there was no enforceable contract because the court was "unable to discern any clearly defined, mutually agreed upon terms relating to the scope of the work, the cost, and the time for performance." *Id.*; *see Cadence Bank, N.A.*, 473 S.W.3d at 774 (Tenn. Ct. App. 2015) ("Without evidence regarding the specific terms of an alleged oral agreement, we cannot find, as a matter of law, that a contract was formed."); *Cummins v. Opryland Prods.*, No. M1998-00934-COA-R3-CV, 2001 WL 219696, at *3 (Tenn. Ct. App. Mar. 7, 2001) ("Here, the trial court properly determined that there was no contract because there was no

- 11 -

mutual assent as to the terms of the agreement and not all of the essential terms of the contract were included in the initial oral agreement."); *Peoples Bank of Elk Valley*, 832 S.W.2d at 554 ("Here, the essential terms of the alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken. There is, therefore, no contract.").

Likewise, in this case, while the parties agreed that Mr. Givens was to perform certain tasks — painting the home, removing and repairing kitchen cabinets, painting the cabinets, and replacing bathroom countertops — they were at odds over the scope of the work, with Mr. Givens asserting that he was also engaged to perform several other tasks on the house and Dr. Clark asserting that no other work was to be performed. Compounding this disagreement, the parties disagreed over whether the tasks were bid discretely or as a whole, with Dr. Clark asserting the jobs were separate and Mr. Givens asserting that he bid the entire project as one unit. Furthermore, the parties disagreed as the amount that Mr. Givens was to be paid. Dr. Clark asserted the value of the contract was $9,775, while Mr. Givens asserted the value of the contract was $11,575. The trial court found that the parties' divergence was not due to dishonesty on the part of either party or one of the parties misunderstanding the terms of their agreement but was instead the result of the parties talking past each other in such a manner that they never actually arrived at an agreement on the essential terms of the contract. The record establishes that the oral contract contemplated by the parties was not sufficiently definite to be enforceable because the parties did not agree on essential terms, and accordingly, the circuit court did not err in concluding there was no contract and denying relief under the contract to Mr. Givens or Dr. Clark.

V.

Dr. Clark argues that she was denied access to the TCPA in violation of the Fourteenth Amendment, the Tennessee Constitution, and the Code of Judicial Conduct. *See* U.S. Const. amend. XIV, § 1 (". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"); Tenn. Const. art. I, § 17 ("That all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay."); Tenn. Sup. Ct. R. 10, RJC 2.2 ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially."). She alleges that the trial court violated these provisions by refusing to consider and harboring bias against claims raised under the TCPA.

Dr. Clark points to the fact that the circuit court did not make an explicit finding regarding the TCPA claim in its first order.[8] However, any deficiency in the first order is

_____

[8] She also points to statements regarding the difficulty of bringing a TCPA claim allegedly made

- 12 -

not pertinent to our review, as that order was reversed and the case remanded for the court to make further findings of fact and conclusions of law. On remand, the court explicitly addressed the TCPA claim, concluding that "the Tennessee Consumer Protection Act does not apply, because the Court finds there was no misrepresentation on the part of any party." Accordingly, Dr. Clark was not denied access to the court. She was able to present her TCPA claim, which the court considered and rejected based on the court's factual findings.

The TCPA prohibits certain "unfair or deceptive acts or practices affecting the conduct of any trade or commerce," including "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Tenn. Code Ann. § 47-18-104(b)(7).[9] "In order to be successful under the TCPA, there must be a showing of 'some deception, misrepresentation or unfairness, regardless of any breach of contract.'" *Mini Sys. Inc. v. Alexander*, No. W2019-01871-COA-R3-CV, 2020 WL 6892010, at *2 (Tenn. Ct. App. Nov. 24, 2020) (quoting *Hall v. Hamblen*, M2002-00562-COA-R3-CV, 2004 WL 1838180, at *4 (Tenn. Ct. App. Aug. 16, 2004)); *see Fayne*, 301 S.W.3d at 177 ("A deceptive act or practice is, in essence, 'a material representation, practice or omission likely to mislead ... reasonable consumer[s]' to their detriment." (quoting *Ganzevoort*, 949 S.W.2d at 299)).

On appeal, Dr. Clark identifies two alleged misrepresentations that are the basis of her TCPA claim: that Mr. Givens was capable of completing the tasks at issue and that Mr. Givens was an experienced painter. However, as noted above, the circuit court explicitly found that "that there was no misrepresentation that occurred by any of the parties." Pursuant to our analysis of the trial court's credibility determinations above, there was evidence, including the testimony that Mr. Givens was capable and the testimony that he had previously performed satisfactory work, from which the trier of fact could have found that the Givenses were credible when they said that Mr. Givens could do the work and had experience painting. Although Dr. Clark argues that the deposition testimony established that Mr. Givens was incapable of completing the work, any conflict between the Givenses' deposition and trial testimony was resolved by the trial court in favor of the trial testimony.

---

by attorneys she attempted to hire. These statements, purportedly made by unnamed attorneys, are not in evidence and are accordingly not before us. *See* Tenn. R. App. P. 13(c) ("The Supreme Court, Court of Appeals, and Court of Criminal Appeals may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to Rule 14."); *Batey v. Deliver This, Inc.*, 568 S.W.3d 91, 94 n.4 (Tenn. 2019) ("[W]e will not consider information on appeal that was not admitted into evidence and considered by the trial court.").

[9] Before the trial court, Dr. Clark also highlighted the statutory section regarding a home improvement services provider's duty to provide a residential owner notice of acts prohibited by Tennessee Code Annotated section 39-14-154(b) and the contact information of the provider, along with updated contact information. *See* Tenn. Code Ann. § 47-18-104(b)(47); *see also* Tenn. Code Ann. § 47-18-109(a)(1) (limiting recovery to loss sustained "as a result" of the use or employment of the unfair or deceptive acts described in § 47-18-104(b)). However, Dr. Clark does not reference this subsection on appeal or argue that she is entitled to relief under this subsection.

Because the statute only prohibits representing goods or services to be "of a particular standard, quality or grade" when they are in fact "of another," the trial court's finding that Mr. Givens, who testified he was able to complete the work, was credible sounds the death knell for Dr. Clark's TCPA claim.

Dr. Clark does not list a request for attorney's fees in her statement of the issues, but she does request fees in a section of her brief entitled "Additional Claims of Appellant." *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)."). In light of our resolution of the case, Dr. Clark is not in any event entitled to attorney's fees under the TCPA.

VI.

For the aforementioned reasons, we affirm the judgment of the Circuit Court for Dickson County. Costs of the appeal are taxed equally between the appellant, Julie Clark, and the appellee, Jeffrey Givens, for which execution may issue if necessary.

_____
JEFFREY USMAN, JUDGE